UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| **7020 ENTERTAINMENT, LLC,**<br>a Florida limited liability company, d/b/a<br>KOD MIAMI, **MICHAEL COLEMAN**, an<br>individual, **BRIANA KRAVETZ**, an individual,<br>and **KALA MAJORS**, an individual,<br><br>      Plaintiffs,<br><br>vs.<br><br>**MIAMI-DADE COUNTY**, a political<br>subdivision of the State of Florida,<br><br>      Defendant.<br>_____ / | )<br>)<br>)  CASE NO:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, 7020 ENTERTAINMENT, LLC ("KOD"), MICHAEL COLEMAN ("Coleman"), BRIANA KRAVETZ ("Kravetz") and KALA MAJORS ("Majors"), file this Motion for Preliminary Injunction, pursuant to Rule 65, Fed.R.Civ.P. and Rule 7.1, S.D.Fla.Loc.R., seeking a preliminary injunction prohibiting Miami-Dade County from enforcing its emergency COVID curfew orders (Amendment 3 to Emergency Order 27-20 and Amendment 1 to Miami-Dade County Emergency Order 30-20), and state in support thereof:

### MATERIAL FACTS AND SUMMARY OF CLAIMS[1]

1.    Plaintiff KOD operates a full-service restaurant and bar which provides live entertainment in the form of exotic dance within Miami-Dade County. The dance provided by Plaintiffs is a form of non-obscene, constitutionally protected expression that is presumptively protected by the First Amendment to the United States Constitution. (Cmplt at ¶¶ 14, 14, 17).

---

[1] Plaintiffs do not seek preliminary injunctive relief with respect to their Equal Protection and Fourth Amendment claims (Counts IV and V) as those claims require factual development as opposed to the primarily facial claims addressed in this Motion.  Plaintiffs do not waive or abandon any those claims, or any others asserted in the Complaint, and specifically reserve the right to seek a determination on the merits of all claims asserted.

2.      KOD's restaurant facilities and operations are not designed to accommodate take-out or delivery food services.

3.      Coleman works at KOD in a managerial capacity. Kravetz works as a bartender. Majors is an independent contractor who performs exotic dance at KOD. All three individuals have occasion to travel within Miami-Dade County to shop, obtain medical care, seek entertainment and to enjoy the companionship of friends and family residing in the County.

4.      On September 25, 2020, the Governor of Florida issued Executive Order 20-244[2] based on a finding that "the State of Florida has suffered economic harm as a result of COVID-19-related closures, exacerbating the impacts of the State of Emergency, and Floridians should not be prohibited by local governments from working or operating a business. (Cmplt, Ex. 3). Executive Order 20-244 limited the ability of local governments to enact emergency orders in the wake of the COVID-19 pandemic in the following respects:

A.      It immediately directed the reopening of all businesses in Florida and expressly preempted all inconsistent local emergency ordinances:

Section 2.      Right to Work and Operate a Business.

No COVID-19 emergency ordinance may prevent an individual from working or from operating a business. This preemption is consistent with Executive Order 20-92

B.      It prohibited local governments from reducing the capacity of restaurants below 100% occupancy except where the local government makes a specific fact-based showing that "quantify the economic impact of each limitation or requirement on those restaurants" and "explain[s] why each limitation or requirement is necessary for public health." *See*, Executive Order 20-244 §3 A-i and -ii. Even when such a showing is made, a local government is not permitted to reduce occupancy levels below fifty percent: "Restaurants… may not be limited by a COVID-19 emergency order by any local government to less than fifty percent (50%) of their indoor capacity." *See*, Executive Order 20-244 §3 A.

5.      Miami-Dade County enacted two curfew Ordinances which directly impact the

---

[2]  On November 24, 2020, Governor DeSantis adopted Executive Order 20-297 which extended and ratified the effect of Executive Order 20-244 but did not change its substantive provisions.

Plaintiffs' right to work, operate a business and travel within the County:

    A.     On October 10, 2020, the County adopted "Amendment 3 to Emergency Order 27-20" which imposes a curfew from midnight until 6:00 A.M. against some businesses and individuals, including the Plaintiffs (Cmplt, Ex. 5):

        1.     Commencing on October 12, 2020 at 12:01 a.m., a curfew is hereby imposed for all of Miami-Dade County, including incorporated and unincorporated areas, effective from 12:00 a.m. each night through 6:00 a.m. the next morning, until cancelled or revised. During the period of such curfew, no person shall make use of any street or sidewalk for any purpose, except police, fire rescue, first responder, medical, health care, media, and utility repair service personnel. In addition, the curfew shall not apply to persons:…

    B.     On October 14, 2020, Miami-Dade County adopted "Amendment 1 to Miami-Dade County Emergency Order 30-20" which applies specifically to restaurants. (Cmplt Ex. 7). That Order adopted the same 12:00 midnight to 6:00 A.M. curfew as that imposed by Order 27-20. In addition, Amendment 1 to Emergency Order 30-20 adopted a fifty percent occupancy restriction for most restaurants.[3]

    6.     The two curfew orders prevent KOD from operating between midnight and 6:00 A.M. In particular, the curfews orders would not permit KOD to offer exotic dance entertainment to patrons during those hours. In addition the curfew reduces KOD's restaurant to zero occupancy after midnight which necessarily means that there are no dancers or patrons during those hours.

    7.     Coleman and Kravetz cannot work and Majors cannot perform during the curfew hours nor can they engage in normal personal and social activities such as shopping or visiting friends and family.

    8.     The two curfew Orders have actually been applied against Plaintiffs. The KOD business has been involuntarily closed on multiple occasions (twice even before the midnight curfew went into effect). On one occasion a KOD employee was cited for violating the curfew and arrested on related charges.

---

[3] Another recent Emergency Order appears to exempt parks and recreational facilities from the curfew. Amendment 3 to Emergency Order 29-20, adopted on October 23, 2020, states that "this Amendment removes limitations on park operating hours…". (Cmplt. Ex. 6).

9.     Plaintiffs' legal challenges fall into four general categories:[4]

A.     The curfew violates the First Amendment in the following respects:

(1)     It is content-based and viewpoint-based because of the multiple exemptions which favor some speakers, including churches and other religious institutions, government facilities, media (newspapers, TV, stations, etc.), colleges and universities, and sporting events.

(2)     The multiple exclusions and exemptions make the curfew orders unconstitutionally underinclusive.

(3)     The curfew is not narrowly tailored as less restrictive means of regulation, such as social distancing and hygiene measures, can more effectively limit the spread of Coronavirus without impacting speech so severely.

B.     The curfew violates the Florida Constitutional guarantees of privacy and association as applied to Coleman, Kravetz and Majors because it is neither supported by a compelling interest nor narrowly tailored.

C.     The curfew Orders are not authorized by local law and are *ultra vires* because they do not implement a "general curfew" as required by §8B-7(2)(e) of the Miami-Dade Code of Ordinances.

D.     The curfew Orders have been expressly and impliedly preempted by Executive Order 20-244.

## MEMORANDUM OF LAW

### I.     PRELIMINARY INJUNCTION STANDARD.

In order to obtain a preliminary injunction, a plaintiff must show the following: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. Am. Civil Liberties Union of Florida, Inc. v. Miami-Dade County. Sch. Bd.,

---

[4]  Each of these claims assert facial and as-applied challenges. The individual facts of this case are irrelevant to Plaintiffs' facial claims. *See,* Sentinel Communications Co. v. Watts, 936 F.2d 1189, 1197 (11th Cir. 1991) ("In a facial challenge such as this, the facts of the challenging party's case are irrelevant.").

557 F.3d 1177, 1198 (11th Cir. 2009). Plaintiffs can easily meet each requirement.

## II.   PLAINTIFFS HAVE THE REQUISITE STANDING; THIS CASE IS RIPE; AND THERE ARE NO GROUNDS FOR ABSTENTION.

There is no question that Miami-Dade's emergency COVID Orders apply to these Plaintiffs. The Orders specifically state that the curfew and occupancy limitations apply to restaurants and KOD is a licensed restaurant. In addition, Defendant's police officers have already enforced the Orders against Plaintiffs in the most direct manner possible: through the forced closure of the Club. Plaintiffs obviously have standing to pursue their claims. *See, generally*, Wollschlaeger v. Governor, Fla., 848 F.3d 1293 (11th Cir. 2017) ("When an individual is subject to [the threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."). There is no plausible reason for this Court to abstain from ruling in this case.[5]

## III.   PLAINTIFFS ARE THREATENED WITH IRREPARABLE INJURY.

No lengthy argument on this point is necessary. The deprivation of rights guaranteed under the First Amendment is an irreparable injury as a matter of law. Elrod v. Burns, 427 U.S. 347, 373 (1976). Since the Plaintiffs allege that they are threatened with the loss of First Amendment rights, irreparable injury is presumed. *See,* FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017) ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury."). Florida Courts likewise recognize that injunctive relief is warranted where the state constitutional right of privacy is at issue. *See, e.g.*, Gainesville Woman Care, LLC v. State, 210 So.3d 1243 (Fla. 2017).

Injunctive relief is also appropriate where the plaintiff has demonstrated that a law or government action has been preempted. *See, e.g.*, ABC Charters, Inc. v. Bronson, 591 F.Supp. 2d

---

[5]  Abstention would not be proper under Younger v. Harris. 401 U.S. 37 (1971) because there are no pending state court proceedings. Likewise, because this case does not present difficult and unsettled areas of state law, Railroad Comm'n v. Pullman, 312 U.S. 496 (1941) is inapplicable. As the Supreme Court said in Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S. Ct. 1236, 1244 (1976), "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule."

1272, 1307 (S.D. Fla. 2008) (Injunction was appropriate where travel agencies claimed that Florida's Sellers of Travel Act was preempted by several Federal laws).

## IV.   THERE IS A STRONG LIKELIHOOD THAT PLAINTIFFS WILL PREVAIL ON THE MERITS OF THEIR CLAIMS.

### A.   The Curfew Orders Violate the First Amendment

Courts universally recognize that exotic dance of the kind offered by Plaintiffs is protected by the First Amendment. *See, e.g.*, City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) ("[N]ude dancing of the type at issue here is expressive conduct…").[6] The curfew orders do not specifically target speech and do not directly order Plaintiffs and other speakers to stop presenting entertainment or communicating their message. However, censorship is the unavoidable outcome of these orders as they prohibit patrons, performers and employees from accessing the premises after hours, when entertainment venues, including KOD, are traditionally open.

The fact that speech is not directly targeted would normally mean that the curfew orders would be treated as "content-neutral" for purposes of the First Amendment. However, a singular feature of the Miami-Dade Orders is that they include numerous exceptions from the curfew which are defined either in terms of speech (in particular, religious speech) or the identity of the speaker

---

[6] Churches and exotic dancers are on equal footing when it comes to the First Amendment. *See, e.g.*, Brownell v. City of Rochester, 190 F. Supp. 2d 472, 477 (W.D. N.Y. 2001) ("A newcomer to the dispute over barroom nude dancing might well express skepticism that such activity is covered by the First Amendment at all… [A]s a matter of constitutional law the matter largely has been put to rest. The United States Supreme Court has established that such activity, provided that it is not obscene, constitutes expressive conduct that is entitled to protection under the First Amendment."). To be sure, the Supreme Court has adopted a legal fiction known as the "secondary effects" doctrine which treats laws targeting adult entertainment as content neutral, but otherwise subject to First Amendment requirements. *See, e.g.*, City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 448 (2002) (J. Kennedy, concurring) ("The fiction that this sort of ordinance is content neutral … is perhaps more confusing than helpful… These ordinances are content based, and we should call them so."). However, the secondary effects doctrine deals with unique externalities which are believed to be associated with adult businesses, such as increased crime and lower property values. Id. The secondary effects doctrine has nothing to do with COVID or the County's interest in limiting its spread. As Aaron Burr sang in the musical Hamilton: "Death doesn't discriminate between the sinners and the saints, it takes and it takes and it takes…" *Wait for It*, Hamilton (2015) (lyrics accessible at https://www.themusicallyrics.com/h/351-hamilton-the-musical-lyrics/3694-wait-for-it-lyrics-hamilton-the-musical.html).

(including the exemptions for professional and college sporting events, government facilities and "media").[7] The exemptions have the effect of transforming an otherwise content-neutral law into a viewpoint-based restriction on speech which must satisfy strict scrutiny:[8]

> Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.
>
> Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to the content of the regulated speech'…. Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163–64 (2015).

**(1)    The Curfew Orders are Content-Based and Viewpoint-Based.**

The curfew Orders violate the First Amendment because they exempt certain speakers from

---

[7]  For First Amendment purposes, Plaintiffs are not alleging that Miami-Dade County lacks the legal authority to enact a curfew (although that is obviously a problem in terms of the Governor's preemption of local emergency COVID orders and lack of authority / *ultra vires* acts). The First Amendment issue arises because the County differentiates between speakers on the basis of their identity and/or the content of their speech. It is the disparate treatment of speech and speakers that runs afoul of the Constitution.

[8]  The County may argue that First Amendment rights are not implicated under the authority of Arcara v. Cloud Books, Inc., 478 U.S. 697 (1986). That would be a plain misreading of Arcara's holding. By its own terms, Arcara applies only to laws of "general application", affecting everyone in the community. *See, e.g.*, Millennium Restaurants Group, Inc. v. City of Dallas, Texas, 181 F.Supp. 2d 659, 666 (N.D. Tex. 2001) (Distinguishing Arcara on this basis). The curfew orders exempt certain speakers based exclusively on the content of their speech or their identity. The law is not even of general application when it comes to other businesses. Indeed, the forty-six categories of "essential" businesses excluded from the curfew may well make up the ***majority*** of businesses and employees in the County, excluding only restaurants, entertainment venues and some retail stores. *See*, Exhibit A to Amendment 1 to Emergency Order 30-20. Furthermore, the Supreme Court cautioned that First Amendment rights must be protected when an otherwise content-neutral law has the inevitable effect of singling out those engaged in expressive activity. Arcara, 478 U.S. at 704. That is the natural effect of the Miami-Dade curfew which excludes liquor stores and fire arms dealers, but makes little effort to protect businesses engaged in First-Amendment speech.

the restrictions altogether based on their identity and the content of their speech.[9] The favored individuals and organizations are thereby afforded an advantage in the "marketplace of ideas" – they can speak while others are prevented from doing so by order of the government. By its own terms the curfew Orders do not apply to churches and other religious organizations. *See*, Amend. 3 to Emergency Order 27-20, §A-1-f; Ex. A, § pp. They do not apply to college and professional sporting events.[10] They do not apply to the government's own facilities, officers and events.[11] They also do not apply to a host of "essential businesses" Id. - Ex. A §§ (a)-(pp). The exempt businesses include "newspapers, television, radio, and other media services". Id., Ex. A, § e.

Churches are exempted from the curfew Orders solely because of the religious nature of

---

[9] There is no "COVID exception" to the First Amendment. In Roman Catholic Diocese of Brooklyn v. Cuomo, _ S. Ct. _, 2020 WL 6948354 (U.S. Nov. 25, 2020) the U.S. Supreme Court enjoined a COVID lockdown order which required churches to suspend services while allowing a variety of businesses to remain open. The Court found that strict scrutiny applied even during the pandemic:

> Because the challenged restrictions are not "neutral" and of "general applicability," they must satisfy "strict scrutiny," and this means that they must be "narrowly tailored" to serve a "compelling" state interest.

Id. at *2. The narrow tailoring component of First Amendment analysis has also survived the pandemic. *See*, Id. ("Stemming the spread of COVID–19 is unquestionably a compelling interest, but it is hard to see how the challenged regulations can be regarded as 'narrowly tailored.'").

[10] Sports events invoke First Amendment protections for a host of reasons ranging well beyond the contest itself. Those concerns including broadcast rights, branding (right of publicity), merchandising, advertising and the right of patrons to attend games for the purpose of sheer entertainment and to associate with other fans. *See, generally*, Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 790 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters, but we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try.").

[11] The exemption for government facilities cannot be justified based on the government speech doctrine. That is because the exemption is not linked to any particular message the government wishes to advance. *See, generally*, Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200 (2015). Rather, the exemption is viewpoint-based because it favors a particular government speaker (the government) over all other individuals regardless of whether a particular government facility is more or less likely to facilitate the spread of COVID-19. Even more ironic is the fact that many government facilities have an on-premises restaurant which would be subject to the curfew if a private facility, but is exempt if it is run by the government. How does that make any sense?

their speech. Churches are not exempted because they are large enough to support social distancing, or because they are located in a particularly safe area of town or because altars naturally repel viruses. Churches are not identified in terms of their physical characteristics at all, but described only in terms of the subject of their communications:

> [T]he curfew shall not apply to persons:
> …
> f.        Traveling to or from any religious service.

Amend. 3 to Order 27-20, A-1-f.

Churches are also listed among those "essential services" whose workers are entirely exempt from the curfew:

> [T]he curfew shall not apply to persons:
> …
> a.        Working at essential establishments listed in attached exhibit A;
>
> Essential establishments are:
> …
> pp.        Persons providing religious services, in any capacity.

Amendment 3 to Order 27-20, A-1-a; Exhibit A, § pp.

The First Amendment does not tolerate laws which make distinctions based on the content of someone's speech or the identity of the speaker:

> Content-based laws - those that target speech based on its communicative content
> - are presumptively unconstitutional and may be justified only if the government
> proves that they are narrowly tailored to serve compelling state interests.

Reed, 576 U.S. at 163. The Miami-Dade curfew orders cannot meets this stringent standard.

KOD is subject to a law which treats it differently from other similarly-situated speakers. *See, generally*, Time Warner Cable, Inc. v. Hudson, 667 F.3d 630, 636 (5th Cir. 2012) ("When the government targets certain speakers for the exclusion of benefits bestowed on similar parties, 'no further showing of suffering based on that unequal positioning is required for purposes of standing.'"). Viewpoint based discrimination is recognized where the government favors certain speakers over other others or imposes restrictions on some speakers and not on others:

> Government discrimination among viewpoints - or the regulation of speech based
> on "the specific motivating ideology or the opinion or perspective of the speaker"
> – is a "more blatant" and "egregious form of content discrimination." Rosenberger
> v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 132

L.Ed.2d 700 (1995). But it is well established that "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N. Y., 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. Ibid.
….

In any case, the fact that a distinction is speaker based does not, as the Court of Appeals seemed to believe, automatically render the distinction content neutral. Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," Citizens United v. Federal Election Comm'n, 558 U.S. 310, 340, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), we have insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."

Reed, 576 U.S. 168-170; *See, also,* R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 386 (1992) ("The government may not regulate use based on hostility - *or favoritism* - towards the underlying message expressed." (emphasis added)).

The exclusion for churches based on the content of their religious speech is particularly troublesome.[12] The First Amendment does not allow the government to favor religious speakers over atheists – or over exotic dancers for that matter. *See,* Perrier-Bilbo v. United States, 954 F.3d 413, 422 (1st Cir. April 3, 2020) ("[T]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another," … nor can the government

---

[12] Religious institutions are not only exempt from the curfew requirements, but they also are not required to comply with social distancing requirements. *See,* §8 of Amendment 1 to Emergency Order 30-20 ("Persons attending religious services are urged, but are not required, to practice social distancing, such as keeping six feet between persons and limiting group size…"). Churches are known for their close fellowship, praying singing and dancing - all activities which make them hotbeds for virus transmission. *See, e.g.,* Newsweek, 11/2/20 "Nearly 150 COVID Cases Linked to Church in Massachusetts" https://www.newsweek.com/coronavirus-covid-cases-linked-church-massachusetts-fitchburg-crossroads-community-1543961 (last accessed 12/15/20). It is utterly irrational and completely unconstitutional to impose a curfew on restaurants and other businesses (which mandate masks and practice social distancing) while allowing far riskier behaviors at churches, synagogues and mosques. These content-based exceptions also suggest that the curfew is only loosely associated with the purported government interest and that more narrowly-tailored restrictions (like those applicable to churches) will satisfy that interest.

prefer religion over nonreligion…"). In its latest decision involving a COVID restriction the Supreme Court reiterated that religious speech must be treated exactly the same as other speech – neither favored nor disfavored. *See*, Roman Catholic Diocese of Brooklyn, *supra*. The distinctions made by the County are not supportable at any level of review and cannot survive strict scrutiny.

**(2)** **The Curfew Orders are Unconstitutionally Underinclusive.**

The numerous curfew exemptions create obvious problems of underinclusivity.[13] The issue of unconstitutional underinclusiveness arises anytime the government focuses on one speaker or one category of speech while seemingly ignoring other, similarly-situated speakers. *See, generally*, Brown v. Entm't Merchants Ass'n, 131 S. Ct. 2729, 2740 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."); *See, also*, Reed, 576 U.S. at 172 ("[A] 'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.'" (citation omitted)).

Examples of underinclusive laws include the sign law at issue in Reed. In that case, the local government had prohibited temporary signs providing notice of church services while excluding 23 categories of signs from those regulations. Reed, 576 U.S. at 159; *See, also*, Cahaly v. Larosa, 796 F.3d 399, 406 (4th Cir. 2015) ("[T]he statute suffers from underinclusiveness because it restricts two types of robocalls - political and consumer - but permits 'unlimited proliferation' of all other types."). The numerous carve-outs for churches, sporting events, media, government facilities (including public meetings) show that the curfew Orders improperly favor some speakers for reasons having nothing to do with the spread of the Coronavirus.

**(3)** **The Curfew Orders are not Narrowly Tailored.**

Even if strict scrutiny does not apply, a law incidentally impacting speech must still be

---

[13] There is also no "COVID exception" to the requirement that laws impacting speech rights avoid underinclusive categories. *See, e.g.*, Soos v. Cuomo, 470 F.Supp. 3d 268, 282 (N.D. N.Y. June 26, 2020) (Striking COVID order which restricted church occupancy, but not that of secular businesses; On Fire Christian Ctr., Inc. v. Fischer, 453 F. Supp. 3d 901, 911 (W.D. Ky. April 11, 2020) (Same).

narrowly tailored and directly advance the asserted government interest. *See*, Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("[G]overnment may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" (citation omitted)). The curfew is equivalent to a ban on nearly all speech – and certainly KOD's speech - after midnight. Total bans are strongly disfavored under the law and will seldom, if ever, be upheld. *See*, Fane v. Edenfield, 945 F.2d 1514, 1517 (11th Cir. 1991) ("Blanket prohibitions on commercial speech are disfavored.").[14] It is apparent that the County has enacted (and has the ability to enforce) a host of effective anti-viral measures including a mask requirement and the social distancing and sanitation protocols advocated by the CDC. Apparently, the County has concluded that these measures are perfectly fine during daytime and evening hours and are also effective for churches, government, sports venues and many businesses at all hours of the day or night.[15]

A law is not narrowly tailored if there are obvious alternatives available which are disregarded by the local government. FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1300–01 (11th Cir. 2017) ("[T]here is a significant distinction between failing to employ less-restrictive means and completely disregarding obvious less-burdensome alternatives… By

---

[14]    On-line streaming would <u>not</u> be an alternative avenue of communication for Plaintiffs. Plaintiffs' performers are banned from travelling to and from the club after midnight. The fact that there may be an on-line audience for the entertainment hardly matters when there is nobody present at the club who can produce the entertainment.

[15]  There is no scientific evidence to support the conclusion that COVID transmission rates are greater in the early morning hours than they are at any other time of day. The CDC website lists a number of risk factors and best practices, none of which have anything to do with the time of day. *See, generally*, CDC Frequently Asked Questions found at https://www.cdc.gov/coronavirus /2019-ncov/faq.html; *See, also*, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html#guiding-principles; (last accessed 12/15/20). Rather the key variable appears to be the number of hours people are in close proximity at any one time (*i.e. the total duration* of an event). *See*, https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/holidays.html (last accessed 12/15/20) ("Gatherings that last longer pose more risk than shorter gatherings.").

ignoring far less restrictive and precise means, it is likely that an ordinance burdens substantially more speech than necessary."). Similarly, the government cannot excuse its obligation to adopt less restrictive means of regulation on the plea that "enforcement is hard". *Compare*, FF Cosmetics FL Inc. v. City of Miami Beach, 129 F. Supp. 3d 1316, 1329 (S.D. Fla. 2015) (Jimenez offered only weak explanations as to why "solicitation boxes" would not work, including that "we couldn't guarantee people would stay in them. The court is not convinced.").

### B. The Curfew Orders Infringe Upon Plaintiffs' Privacy, Free Association and Assembly Rights in Violation of the Florida Constitution.

America is the land of the free. Part of that freedom is the right to go where we please, when we please. *See,* Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 901 (1986) ("[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution."). Florida Courts recognize that curfews infringe directly on that liberty interest and are therefore disfavored in the law. *See, e.g.*, K.L.J. v. State, 581 So.2d 920, 922 (Fla. 1st DCA 1991) ("The great majority of courts, however, have found that general curfew ordinances impermissibly infringe on basic constitutional rights."). Our Courts evaluate this right in terms of the right of privacy and the right of assembly and free association. The Florida Constitution guarantees the right of privacy to every person [FLA. CONST. Art. I, § 23] as well as the right to assemble and to freely associate [FLA. CONST. Art. I, § 5].

The Miami-Dade curfew Orders interfere with Coleman, Kravetz and Majors' liberty of movement, their privacy rights and their right to associate. In fact, it effectively nullifies each of those rights between midnight and 6:00 A.M. every day when Plaintiffs could otherwise come and go as they pleased – whether to go to work, to dine at a favorite restaurant or to enjoy the company of their friends and family.[16]

In Florida, curfew ordinances are subject to strict scrutiny and may only be upheld if they are supported by a compelling government interest and are narrowly tailored:

> As we unanimously ruled in our initial review of these cases, in Florida "strict scrutiny applies when reviewing a juvenile curfew ordinance." T.M.,784 So.2d at

---

[16] The fact that these same rights are fully preserved for priests, ministers, rabbis, County Commissioners and football players is small consolation to Mr. Coleman, Ms. Kravetz and Ms. Majors.

444; *see also* <u>J.P.</u>, 788 So.2d at 953; <u>R.J.H. v. State</u>, 788 So.2d 952, 952 (Fla. 2001); <u>J.A. v. State</u>, 788 So.2d 953, 954 (Fla. 2001); <u>D.N.S. v. State</u>, 788 So.2d 955, 955 (Fla. 2001); <u>M.R. v. State</u>, 788 So.2d 957, 958 (Fla. 2001).

…

The fundamental rights to privacy and freedom of movement are implicated by these ordinances. It is settled law that each of the personal liberties enumerated in the Declaration of Rights of the Florida Constitution is a fundamental right. See generally <u>Traylor v. State</u>, 596 So.2d 957 (Fla. 1992). "Florida courts consistently have applied the 'strict' scrutiny standard whenever the Right of Privacy Clause was implicated, regardless of the nature of the activity." <u>N. Fla. Women's Health & Counseling Servs., Inc. v. State</u>, 866 So.2d 612, 635 (Fla. 2003)… Strict scrutiny requires the State to demonstrate that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means.

<u>State v. J.P.</u>, 907 So.2d 1101, 1107, 1109–10 (Fla. 2004).[17]

Even when an overriding government interest exists – such as the effort to combat the current pandemic - the Florida Constitution will not tolerate a blanket ban on the exercise of fundamental rights:

The general right of every person to engage in lawful activity, while subject to reasonable restriction, cannot be completely taken away under the guise of police regulation. An ordinance to the contrary is an arbitrary invasion of the inherent personal liberties of all citizens. Thus, since it cannot be said that prohibition against the mere presence of a child under the age of sixteen on a street or park or other public place between 11:00 P.M. and 5:00 A.M. for a purpose other than required by his occupation or unless accompanied by his parent or guardian has any real relationship to the primary purpose of the statute, it therefore constitutes an invasion of personal rights and liberties and for that reason is unconstitutional.

<u>W. J. W. v. State</u>, 356 So.2d 48, 50 (Fla. 1st DCA 1978).  As with First Amendment rights, Florida

---

[17] All of Florida's reported curfew cases appear to involve laws applicable only to minors. In such cases, the Courts are quick to recognize that the government has a greater interest in regulating the health and safety of minors who may not have the wisdom that comes with age. *See, e.g.*, <u>State v. J.P.</u>, 907 So. 2d at 1111 ("Differential treatment of minors may be based upon "the particular vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." (citation omitted)). The Miami-Dade curfew Orders are not based on age, but apply to adults as well as children. Accordingly, the special considerations which informed the Court when considering the minor curfew laws play no role here. In any event, the age of the plaintiffs in the various minor curfew cases does not seem to have kept any Court from striking down those laws. *See*, <u>Id</u>.

law requires that restrictions on free movement and association be narrowly tailored.[18] It is obvious that the County imposed the strictest possible regulation on KOD and other businesses without so much as considering readily available alternatives. *See, e.g.*, State v. Bradford, 787 So.2d 811, 827 (Fla. 2001) ("The restriction in this case, however, is far from being narrow in scope or duration. It prohibits solicitation - whether face-to-face, telephonic or written - at all times.... Although the State posits that this is a narrow restriction, common sense indicates otherwise."); State v. O'Daniels, 911 So.2d 247, 253 (Fla. 3d DCA 2005) ("Although we recognize the City's interests in traffic regulation, we find that the City and State have not met their burden of showing that the ordinance is narrowly tailored. The ordinance applies to all public property, rather than just the areas that have known problems with traffic congestion.").

There is an additional element of the Miami-Dade Orders which runs afoul of the narrow tailoring requirement: they allow for the closure of businesses and arrest of alleged violators.[19] The Florida Supreme Court has suggested that criminal penalties are legislative overkill and that anything other than civil fines will fail the narrow tailoring requirement in the context of a curfew ordinance. *See*, State v. J.P., 907 So.2d 1101, 1119 (Fla. 2004) ("The criminal sanctions are antithetical to the stated interests of protecting juveniles from victimization. Further, the imposition of criminal sanctions is not narrowly tailored to achieve the stated interests. The same goals could be achieved by imposing a civil penalty."). In addition, the Ordinance does not exempt the approximately ten percent of the population, including Plaintiff Kravetz, who have already contracted COVID-19, recovered and is now immune according to the scientific consensus.[20]

---

[18] In terms of narrow tailoring, it should not escape the Court's attention that the effect of the curfew is to reduce KOD occupancy to zero every night from 12:00 midnight to 6:00 A.M. The Governor's Executive Order does not allow local governments to reduce restaurant occupancy below 50%.

[19] Pursuant to §8B-12 of the Miami-Dade Code, violations of emergency orders issued by the mayor are "subject to penalties provided in Section 1-5". Section 1-5(a) states that persons who violate the code are subject to "imprisonment in the county jail for a period not to exceed sixty (60) days".

[20] Miami-Dade County has a population of 2,716,940 [https://www.census.gov/quickfacts/ fact/table/miamidadecountyflorida/POP060210] of whom 260,137 have contracted COVID-19 [https://www.nytimes.com/interactive/2020/us/florida-coronavirus-cases.html#county]      (Last

Mandating that those immune citizens give up their rights to privacy, association, speech and expression, without any countervailing governmental interest, is proof positive that the Orders are not narrowly tailored.

### C.   The Emergency Orders are *Ultra Vires* Acts because the Curfew is Targeted and not of General Application.

The County justifies its emergency COVID Orders under §252.46 of the Florida Statutes and claims that it was promulgated pursuant to Section 8B-7(2) of the Miami-Dade County Code. Section 8B-7(2) of the Code provides:

> Once a Local State of Emergency has been declared, the Manager is authorized by the Mayor and the Board to order any or all of the following actions:
> …
> (e)   Curfew: In the period before, or during and immediately after an event, an order imposing a *general* curfew applicable to Miami- Dade County as a whole, or to geographical area(s) of Miami-Dade County and during hours the Manager deems necessary, and from time to time, to modify the hours the curfew will be in effect and what area(s) it applies to… (emphasis added).

The provisions challenged herein do not impose a "general curfew". As noted throughout this brief, the Emergency Orders are most notable for the businesses and individuals which are *exempt from the curfew* rather than the minority who are subject to it. The County has no authority to impose a limited or targeted curfew; the curfew imposed on Plaintiffs and some other businesses is not authorized by law and is *ultra vires*:

> A local government "engages in an 'ultra vires' act when it lacks the authority to take the action under statute or its own governing laws." Neapolitan Enters., LLC v. City of Naples, 185 So.3d 585, 593 (Fla. 2d DCA 2016) (*quoting* Liberty Counsel v. Fla. Bar Bd. of Governors, 12 So.3d 183, 191–92 (Fla. 2009)); *see also* Corona Props. of Fla., Inc. v. Monroe County, 485 So.2d 1314, 1317 (Fla. 3d DCA 1986) (stating in an appeal from a final judgment declaring a building permit void that because the code did not grant a zoning official "the authority to determine when a property owner's rights have vested, the vested rights letter and the 1983 permit issued pursuant to such letter are ultra vires and void ab initio").

---

accessed 12/15/2020) That roughly ten percent of the population can be considered functionally immune from reacquiring the disease *See, e.g.*, Immunity to SARS-CoV-2 Lasts at Least Six Months, Data Show, The Scientist, Nov. 23, 2020, https://www.the-scientist.com/news-opinion/immunity-to-sars-cov-2-lasts-at-least-six-months-data-show-68179 (last accessed 12/15/20).

Braden Woods Homeowners Ass'n, Inc. v. Mavard Trading, Ltd., 277 So.3d 664, 673 (Fla. 2d DCA. 2019); *See, also*, Liberty Counsel v. Fla. Bar Bd. of Governors, 12 So.3d 183, 191 (Fla. 2009) (Florida law describes an "ultra vires" act as "one that is unauthorized; beyond the scope of power allowed or granted by a corporate charter or by law"). Under Florida law, an *ultra vires* act is deemed utterly void and unenforceable. *See*, Edwards v. Town of Lantana, 77 So.2d 245, 246 (Fla. 1955) ("Inasmuch as the contract was *ultra vires* it was wholly void.").

### D.       The Emergency Orders are Expressly and Impliedly Preempted by Executive Order 20-244.

Enforcement of the curfew Orders is barred by express preemption, implied preemption and conflict preemption. Governor DeSantis's Executive Order 20-244 both announces his intention to preempt the field of COVID regulation to the State[21] and to fix the limits of local authority:

Section 2.   Right to Work and Operate a Business

No COVID-19 emergency ordinance may prevent an individual from working or from operating a business. This preemption is consistent with Executive Order 20 92.

In addition, the Governor's Order specifically takes away local government's ability to fine or penalize persons alleged to have violated local COVID orders: [22]

Section 4.   Suspension of COVID-19-related Individual Fines and Penalties

---

[21]   In his most recent press conference, conducted at a restaurant on Tuesday, December 15, 2020, Governor DeSantis was quoted as saying:

"If a local leader wants to put them out of work, you're damn right I'm hobbling them from doing that..." "If they want to shut down businesses, I'm going to stand in the way. ... I don't think government has a right to put these people out of work."

https://www.sun-sentinel.com/coronavirus/fl-bz-desantis-in-west-palm-beach-20201215-zzrpuzwrwvabfnfdxottw3qn7q-story.html?utm_source=onesignal&utm_medium=notification&utm_campaign=2020-12-15-Florida-Gov-DeS (Last accessed 12-16-20).

[22] The Governor's authority to issue executive orders in time of emergency is derived from statute: "[a]ll orders and rules adopted by … any political subdivision … authorized by [SEMA] to make orders and rules have full force and effect of law." §252.46(2), Fla.Stat.

This order, consistent with Executive Order 20-92, suspends the collection of fines and penalties associated with COVID-19 enforced upon individuals.

It is undeniable that Executive Order 20-244 was specifically intended to deprive local governments of the right to pass or enforce any COVID restrictions on business except for the limited occupancy restrictions allowed under Section 3-A (and even then, contingent upon the local government's ability to specifically justify those restrictions as "necessary for public health").

Miami-Dade County may not enact Orders which contravene the limits of its authority fixed by Governor DeSantis:[23]

> "Florida law recognizes two types of preemption: express and implied. Express preemption requires a specific legislative statement; it cannot be implied or inferred." Sarasota All. For Fair Elections, Inc. v. Browning, 28 So.3d 880, 886 (Fla. 2010). To meet the demands of express preemption, the statute is required to contain "specific language of preemption directed to the particular subject at issue." Santa Rosa Cty. v. Gulf Power Co., 635 So.2d 96, 101 (Fla. 1st DCA 1994). "Express preemption of a field by the legislature must be accomplished by clear language stating that intent." Phantom of Clearwater, Inc. v. Pinellas Cty., 894 So.2d 1011, 1018 (Fla. 2d DCA 2005) (citing Santa Rosa Cty., 635 So.2d at 101).

Lake Hamilton Lakeshore Owners Ass'n, Inc. v. Neidlinger, 182 So.3d 738, 742 (Fla. 2d DCA 2015); See, also, Santa Rosa County v. Gulf Power Co., 635 So.2d 96, 101 (Fla. 1st DCA 1994) (Finding express preemption where statute stated that "such preemption shall supersede any local or special act or municipal charter where any conflict of authority may exist.").

The County Order specifically prohibits restaurants and those who work there from operating for six hours out of every twenty-four – a full 25% of the working day. Miami-Dade County's curfew Orders do exactly what the Governor's Executive Order 20-244 prohibits. Under

---

[23] Plaintiffs disclosed in their Complaint the fact that the Third District Court of Appeal rejected Plaintiffs' preemption arguments in the case of Miami-Dade County v. Miami Gardens Square One, Inc., _ So.3d _, 3D20-1512, 2020 WL 6472542 (Fla. 3d DCA Nov. 4, 2020). The Court did not reach any of that plaintiff's constitutional claims or other claims based on state law. Miami Gardens Square One is not binding on this Court and, for the reasons expressed in this brief, should not be followed. The appellate Court did not even address the argument that reducing a restaurant's occupancy below fifty percent, by ordering its closure, necessarily conflicts with the Governor's Executive Order which specifically forbids such restrictions.

the local Emergency Orders, Plaintiffs, and some other businesses and individuals are prohibited from operating and working between 12:00 midnight and 6:00 AM.  Nothing in the Governor's Order waives the preemption for that period of time.  Nothing in the Governor's Order creates an exception that would allow the County to regulate when businesses can be open and people can work. Quite the contrary; the Executive Order clearly prohibits anything like Miami-Dade's curfew Orders.

In addition, the practical effect of the curfew Orders is to reduce occupancy to zero for six hours each day. That restriction directly contravenes" Executive Order 20-244 §3A which states that: "Restaurants… may not be limited by a COVID-19 emergency order by any local government to less than fifty percent (50%) of their indoor capacity." The Governor's Order is not time-dependent; it does not allow restaurant capacity to be reduced to zero or twenty-five percent for part of the day; it specifies a minimum 50% occupancy threshold all of the time.[24]

While it is clear that the Miami-Dade County Emergency Orders are expressly preempted by Executive Order 20-244, it also apparent that this field of regulation has been impliedly preempted by Governor DeSantis' Order. "Implied preemption is found where the State legislative scheme of regulation is pervasive and the local legislation would present the danger of conflict with the pervasive regulatory scheme". Hamilton Lakeshore Owners, 182 So.3d at 43. The Governor's Order is a blanket prohibition as to any COVID-19 emergency order which might prevent an individual from working or from operating a business. It prevents a local government from reducing restaurant capacity below 50%. No pronouncement could be more pervasive. Executive Order 20-244 occupies the entire field of regulation leaving no space for local governments to legislate (beyond limited regulation of restaurant capacity). *Compare*, Masone v. City of Aventura, 147 So.3d 492, 496–97 (Fla. 2014) (Where the Legislature stated that any local ordinances "on 'a matter covered by' the chapter are preempted unless an ordinance is 'expressly authorized' by the statute", the ordinance was preempted because there was in fact no

---

[24]  The County may argue that it allows restaurants to do as much take-out and delivery business as the market will bear even during curfew hours. However, that is clearly not what Governor DeSantis had in mind when he set the minimum level based on "*indoor* capacity"; the Executive Order clearly contemplates that the occupancy standards apply to in-person, indoor dining.

statutory authorization for it).[25]

## IV.     __THE FACTORS FOR INJUNCTIVE RELIEF FAVOR THE PLAINTIFFS__.

As a matter of law, the harm to Plaintiffs is irreparable. However, if a preliminary injunction issues, Miami-Dade County will suffer no harm, as the City will be precluded from enforcing patently unconstitutional and unauthorized Orders. "[A] sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." Florida Medical Ass'n v. U.S. Dept. of Health, Education and Welfare, 601 F.2d 199, 201, n. 2 (5th Cir. 1979). County orders are not immune from injunctive relief simply just because they are adopted during a pandemic. *See, generally*, Roman Catholic Diocese of Brooklyn, *supra*. In any event, the County's effort to combat the coronavirus will scarcely be affected by the relief sought: Plaintiffs are already allowed to operate for part of the day; the curfew excludes more businesses and individuals than it regulates; and effective restrictions including a mask requirement, social distancing and sanitary protocols will all remain in place.

An injunction which prevents the enforcement of a patently unconstitutional Ordinance does not disserve the public interest. To the contrary, "enjoining the ordinances, if they were found to be in violation of the First Amendment, would advance the public's interest in freedom of speech." FF Cosmetics, 866 F.3d at 1298. The bond requirement, if any, should be *de minimis*. *See*, Univ. Books & Videos, Inc. v. Metro. Dade Cty., 33 F.Supp. 2d 1364, 1374 (S.D. Fla. 1999) ("[C]ourts have held that security is not required … when demanding a bond from the party seeking the injunction would injure the constitutional rights of the party or the public…").

---

[25] In addition to field preemption, Florida recognizes the concept of "conflict" preemption. *See*, Sarasota Alliance for the Fair Election, Inc. v. Browning, 28 So.3d 880, 888 (Fla. 2010) ("The test of conflict between a local government enactment and state law is 'whether one must violate one provision in order to comply with the other'. Putting it another way, a conflict exists when two legislative enactments 'cannot coexist.'"). It should be obvious that Miami-Dade law enforcement officers cannot simultaneously obey the Governor's command that all businesses be allowed to open and the County's instruction that the same businesses be closed for part of each day.

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion has been furnished to DAVID M. MURRAY, Esquire [dmmurray@miami-airport.com], Miami-Dade County Attorney Office, P.O. Box 25504, Miami, Florida 33102-5504 by E-Mail this 17th day of December, 2020.

BENJAMIN, AARONSON, EDINGER
& PATANZO, P.A.

    /s/  Gary S. Edinger

DANIEL R. AARONSON, Esquire          GARY S. EDINGER, Esquire
Florida Bar No.: 314579              Florida Bar No. 0606812
JAMES S. BENJAMIN, Esquire          305 N.E. 1st Street
Florida Bar No.: 293245              Gainesville, Florida 32601
1700 East Las Olas Blvd., Suite 202  (352) 338-4440  (Fax) (352) 337-0696
Ft. Lauderdale, Florida 33301        GSEdinger12@gmail.com
 (954) 779-1700  (Fax) (954) 779-1771
danaaron@bellsouth.net
sexlaw@bellsouth.net

*Attorneys for Plaintiffs*