**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**No. 20-cv-25138-RNS**

**7020 ENTERTAINMENT, LLC d/b/a**
**KOD MIAMI, MICHAEL COLEMAN,**
**BRIANA KRAVETZ, and KALA MAJORS,**
            **Plaintiffs,**

        **v.**

**MIAMI-DADE COUNTY,**
            **Defendant.**
_____/

**MIAMI-DADE COUNTY'S RESPONSE IN OPPOSITION TO**
**MOTION FOR PRELIMINARY INJUNCTION**

COVID-19, as we have all had the misfortune to learn, is caused by an airborne virus that spreads when people inhale virus expelled by other persons and, less frequently, when persons contact SARS-CoV2 particles on surfaces. The disease kills. To date, it has killed 4,413 Miami-Dade County residents and 22,912 Floridians.[1] Over four thousand Americans were killed by COVID-19 on January 6, 2021, alone.[2] The long-term effects of the disease on those who have been infected, but recovered, remain unknown. COVID-19 remains an active threat to all Americans and to Miami-Dade County residents in particular.

Miami-Dade County remains uniquely vulnerable to COVID-19. Over 450,000 County residents are 65 or older; those individuals are at highest risk of negative COVID-19 outcomes, including death.[3] COVID-19 continues to spread aggressively in Miami-Dade County; eleven percent of those tested for COVID-19 have the disease.[4] More worrying, two new COVID-19 mutations (the U.K. variant and the South Africa variant) have been observed in Miami-Dade County. These new mutations are more contagious than the baseline COVID-19 virus.[5] Since the complaint in this case was filed, hospitalizations of County residents rose from 1,034 on December 23, 2020, to 1,158 on January 5, 2021.[6] If hospitalizations continue on this path, it may soon become difficult to staff ICU beds.[7] The County has had more COVID-19 infections than all but three other counties in the nation.[8]

The key to slowing the spread of COVID-19 is trying to minimize the amount of virus a person may contract by inhalation or mucosal contamination.[9] Actions that cannot be taken without a

---

[1] *Florida's COVID-19 Data and Surveillance Dashboard*, Fla. Dep't of Health (Jan. 10, 2021), https://experience.arcgis.com/experience/96dd742462124fa0b38ddedb9b25e429.

[2] Paulina Firozi, *U.S. Records Its Deadliest Day of the Pandemic While Eyes Are on Mob Storming the Capitol*, Wash. Post, Jan. 7, 2020 [ECF No. 20-1].

[3] Affidavit of Dr. Aileen Marty, M.D., FIDSA, ¶ 17 [ECF No. 20-2].

[4] Affidavit of Dr. Lilian Abbo, M.D., FIDSA, ¶ 18 [ECF No. 20-3].

[5] Marty Aff. ¶ 5.

[6] Abbo Aff. ¶ 19.

[7] *Ibid*.

[8] Marty Aff. ¶ 21.

[9] *Id*. ¶¶ 5-6. Initial attempts to minimize the spread of the virus were blunt. The Governor, for example, closed bars and restaurants for weeks, banned nonemergency medical procedures, closed nursing homes to visitors, and required that any person (including Florida residents) traveling into the state from New York or Louisiana be quarantined for fourteen days. *See* Exec. Order No. 20-82 (Mar. 24, 2020) [ECF No. 20-4]; Exec. Order No. 20-111 (Apr. 9, 2020) [ECF No. 20-5]. The County has shifted to more targeted interventions, so no businesses in Miami-Dade County are barred from operating. The County instead requires that residents wear facial coverings when in public, subject to certain exemptions; this rule does not apply to persons eating or drinking. *See* Amendment No. 2 to Miami-Dade County Emergency Order No. 20-20 (Oct. 4, 2020) [ECF No. 20-6]. The County requires that social distancing be observed in all businesses

mask, such as eating and drinking, are considerably riskier than activities that can be done with one.[10] Risk of infection increases in indoor spaces, particularly if there is poor ventilation and large numbers (>10) of individuals from different households inside, as virus particles can float in the air for hours and thus build up over time.[11] When people yell, or laugh, or belch, virus particles can be expelled more than six feet away from the infected person, making social distancing less effective.[12] Activities which combine all of these things—where people are unmasked, indoors, yelling and laughing, and remaining in place for long periods of time—present unique risks, particularly if those people are not conscientious about social distancing.

One such activity, parties, was a driver of the COVID-19 wave that rolled across the County in July and August, and is propelling the current wave of infections and hospitalizations.[13] In Miami-Dade County, young adults have consistently gathered together to socialize; parties were observed in restaurants, bars, rented homes, private homes, warehouses, indoor sports facilities, and on boats.[14] The overwhelming majority of these parties occurred at night.[15] Social distancing and mask usage were rarely observed at these events, likely to due to alcohol usage.[16] Attendees remain together, often unmasked, for long periods of time, yelling and laughing—all high-risk activity.[17] These high-risk behaviors predictably result in infections among the attendees.[18] Contact tracing

---

as part of the County's "New Normal Guidelines." *See* Miami-Dade County Emergency Order No. 31-20 (Oct. 23, 2020) [ECF No. 20-7].

[10] Marty Aff. ¶ 9.

[11] *Id.* ¶ 7.

[12] *Ibid.* Of course, wearing masks will help limit the distance the virus travels even in these circumstances.

[13] *Id.* ¶¶ 11-12; Affidavit of Jennifer Moon ¶ 11 [ECF No. 20-8].

[14] The County is not alone; young-adult partying has been a nationwide problem. *See* Emma Farge, "*Do You Really Need to Party?" WHO Asks World's Youth*, Reuters, Aug. 7, 2020 [ECF No. 20-9]; Rong-Gong Lin II, *Raucous Parties, Young Adults Fueling California's COVID-19 Crisis*, L.A. Times, Aug. 6, 2020, attached as [ECF No. 20-10]; Rachel Adams-Heard, *Young Adults Are Partying Hard and Spreading COVID Quickly*, Bloomberg, July 1, 2020, https://www.bloombergquint.com/coronavirus-outbreak/young-americans-are-partying-hard-and-spreading-the-virus-fast.

[15] Affidavit of Thomas P. Hanlon ¶ 7 [ECF No. 20-11]; Moon Aff. ¶ 10.

[16] Hanlon Aff. ¶ 7; Moon Aff. ¶ 10; Transcript of Special Meeting 11, Miami-Dade Cty. Bd. of Cty. Comm'rs (Oct. 26, 2020) [ECF No. 20-12]; *see also* Mario Ariza, *Pandemic Parties Rage On Across South Florida Despite Growing Coronavirus Outbreak*, S. Fla. Sun-Sentinel, July 10, 2020, https://www.sun-sentinel.com/coronavirus/fl-ne-pandemic-parties-rage-despite-virus-20200710-emsjigrj6vbbtfcrezhmp2ajhq-story.html; Patricia Mazzei, *As the Virus Surged, Florida Partied. Tracking the Revelers Has Been Tough*, N.Y. Times, July 6, 2020 [ECF No. 20-13].

[17] Marty Aff. ¶¶ 7, 9.

[18] *Id.* ¶ 12.

MIAMI-DADE COUNTY'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

data both from this past summer and more recently both indicate that COVID-19 clusters locally often start with a young person.[19] That young person introduces the virus into their household where it infects a parent, a grandparent, or other more vulnerable person. The community is aware of this pattern, and complaints about parties—the risks these parties presented to rest of the community—came from residents, media, and County and municipal elected officials.[20]

> To curtail these chains of infections at their first link, the County instituted a curfew on July 3:
>
> for all of Miami-Dade County, including incorporated and unincorporated areas, effective from 10 p.m. each night through 6 a.m. the next morning, until cancelled or revised. During the period of such curfew, no person shall make use of any street or sidewalk for any purpose, except police, fire rescue, first responder, medical, health care, media, and utility repair service personnel. In addition, the curfew shall not apply to [certain] persons[.][21]

The curfew has since been amended to be in effect from midnight to 6:00 a.m.[22] The County has additionally issued Emergency Order 30-20, which requires businesses to observe social distancing

---

[19]  *Id.* ¶¶ 11, 16.

[20]  Hanlon Aff. ¶ 7.

[21]  Miami-Dade County Emergency Order No. 27-20 (July 2, 2020) [ECF No. 20-14]. Emergency Order 27-20 exempts people (1) working at the essential establishments listed in Exhibit A to the order, (2) returning directly to their homes from work at essential establishments or going directly to work at essential establishments from their homes, (3) making deliveries from essential establishments, and (4) walking their dogs within 250 feet of their residences. *Ibid.* Admittedly, the curfew does not impact religious activities or attendance at professional sports events, in accordance with the Governor's executive orders defining attending religious services conducted in churches, synagogues, and houses of worship as "essential activities" and "preempt[ing] any local rule prohibiting a professional sports team conducting, or the operations of the venue from hosting, those sports activities at facilities in the State." Exec. Order No. 20-91, § 3(A)(i) (Apr. 1, 2020) [ECF No. 20-15]; Exec. Order No. 20-123, § 2 (May 15, 2020) [ECF No. 20-16].

[22]  In the most recent amendment, Mayor Danielle Levine Cava comprehensively outlined the rationale undergirding the curfew:

   [A]s COVID-19 cases rose throughout the summer, testing data and contact tracing indicated that young people were a key driver of infections in the County and were often the ones who introduced COVID-19 into a household[.] . . . [Y]oung adults congregating indoors at restaurants, clubs, and at-home parties often become lax in observing social distancing and mask usage, especially if inebriated, making such parties among young people a unique driver of the spread of COVID-19[.] . . . [D]rinking and eating are often used as an excuse to sidestep mask requirements, and prolonged periods indoors while unmasked raises the risk of exposure to COVID-19[.] . . . [T]hese parties typically occur late at night; and . . . the purpose of the curfew is to discourage individuals from hosting or attending parties and party-like large indoor gatherings late at night where the lack of mask usage, social distancing, and proper hygiene raise the risk of COVID-19 exposure[.] . . . [T]he impact of persons partying late at night is felt elsewhere in the community, as young adults transmit infections picked up at such parties to their children, parents, and grandparents[.]

   Amendment No. 4 to Miami-Dade County Emergency Order No. 27-20 (Dec. 21, 2020) [ECF No. 20-17].

MIAMI-DADE COUNTY'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

and various other requirements; pertinent to this litigation, it requires restaurants to close their on-site dining rooms during the hours of the curfew but allows them to operate their kitchens twenty-four hours a day to deliver food or drink.[23] Neither order places any additional or special restrictions on adult entertainment venues. The curfew impacts not just restaurants but also bars, movie theaters, gymnasiums, amusement parks, bowling alleys, and other similar establishments. No customers can travel to or from any of these businesses after curfew. The purpose of the curfew is to prevent the parties and gatherings where young people spread COVID-19 to each other; preventing these infections keeps COVID-19 out of their parents' homes.[24] The County previously relaxed the curfew in response to changes in local infection rates. However, the social gatherings prevalent over the holidays have predictably led to another local spike.[25] Given the current infection rate, abandoning the curfew all together will result in additional COVID-19 infections and, inexorably, additional deaths.[26]

The curfew was supported by medical experts the County consulted, including experts from the University of Miami, from Florida International University, and from the Jackson Health System.[27] Both Drs. Anthony Fauci and Deborah Birx of the White House Coronavirus Task Force have encouraged the County to keep its curfew in place pending a change in local conditions.[28] The County continues to monitor the trend of the pandemic locally, and will continue to try and balance the disruption caused by the County's Emergency Orders against the potential dead from COVID infections. When appropriate, and consistent with prior practice, the County will relax or lift its emergency restrictions.

Both County orders, 30-20 and 27-20, as amended, allow restaurants to operate their kitchens twenty-four hours a day to deliver food or drink. Neither order places any additional or special restrictions on adult entertainment venues. The curfew impacts not just restaurants but also bars, movie theaters, gymnasiums, amusement parks, bowling alleys, and other similar establishments. No customers can travel to or from any of these businesses after curfew.

The four Plaintiffs challenging those orders in this action are an adult entertainment venue and three individuals. 7020 Entertainment, LLC, which does business as KOD Miami, owns and

---

[23] Miami-Dade County Emergency Order No. 30-20 (Sept. 26, 2020) [ECF No. 20-18].

[24] *Id.*; Transcript of Special Meeting 11-12.

[25] Chris Persaud, *Florida Reports Biggest COVID-19 Spike Since Summer*, Palm Beach Post, Dec. 10, 2020 [ECF No. 20-19].

[26] Marty Aff. ¶ 19.

[27] Moon Aff. ¶ 30; Marty Aff. ¶ 18.

[28] Moon Aff. ¶ 30; Marty Aff. ¶ 18.

operates a restaurant and alcoholic beverage establishment that features live exotic dance. Compl. [ECF No. 1] ¶¶ 10, 15. Michael Coleman is a manager and Briana Kravetz is a bartender at KOD Miami. *Id.* ¶¶ 17-18. Kala Majors is an independent contractor who performs exotic dance routines at KOD Miami. *Id.* ¶ 19. Contemporaneously with their Complaint, the Plaintiffs filed a motion for preliminary injunction [ECF No. 5]. They seek injunctive relief on several grounds, claiming that (1) the curfew orders violate their First Amendment rights, (2) the curfew orders violate rights under the Florida Constitution, and (3) the curfew orders have been preempted by Executive Order 20-244. For the reasons that follow, however, the Plaintiffs have failed to clearly carry their burden of persuasion to show that they are likely to succeed on the merits of any of these claims. The motion for preliminary injunction should be denied.

## LEGAL STANDARD

Plaintiffs seeking preliminary injunctions bear a "heavy burden," *Hardin v. Hous. Chronicle Pub. Co.*, 572 F.2d 1106, 1107 (5th Cir. 1978),[29] because a "preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). *See also Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003) (the grant of a preliminary injunction "is the exception rather than the rule"). This Court may grant a preliminary injunction only if the Plaintiffs "establish four separate requirements—namely, that (1) [they have] a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant[s] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284-85 (11th Cir. 2020). The Plaintiffs bear "the 'burden of persuasion' to *clearly establish*" all four elements. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (emphasis added) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)).

## ARGUMENT

**The Plaintiffs Do Not Show a Likelihood of Success on the Merits.**

**A.    The Plaintiffs have not shown a likelihood of success on the merits of their preemption claims because the Florida Third District Court of Appeal has conclusively rejected the argument that the County's curfew orders have been preempted.**

The Plaintiffs claim that the Governor's Executive Order 20-244 preempts the County's

---

[29] When quoting cases, all citations, footnotes, and internal punctuation marks are omitted and all alterations are adopted, unless otherwise noted.

curfew orders, either expressly, impliedly, via conflict preemption, or by rendering the orders *ultra vires*. *See* Pls.' Motion 17-20. They have not made—and cannot make—a clear showing that they are likely to succeed on the merits of these purely state law claims because the Florida Third District Court of Appeal has explicitly rejected them. In *Miami-Dade County v. Miami Gardens Square One, Inc.*, that court correctly held that nearly identical preemption claims challenging the County's curfew orders—brought by an adult entertainment venue called "Tootsie's" and one of its employees—were unlikely to succeed on the merits. — So. 3d —, 2020 WL 6472542, at *2-6 (Fla. 3d DCA Nov. 4, 2020).

Following Florida's rules for statutory construction, the court first determined that "what the Governor meant by emergency measures that 'prevent an individual from working or from operating a business' . . . were enactments of law that expressly prohibited and altogether closed businesses down." *Id.* at *4. The County's curfew, which "allows Tootsie's to operate from six a.m. to midnight daily, [did] not fall within this express limitation." *Ibid.* Tootsie's could not show that the executive order "*clearly* and *expressly* preempted the County's curfew," as required for an express preemption claim to succeed, because "[h]ad the Governor meant to preempt local governments from imposing curfews, he could have said so." *Ibid.* (emphases in original).

The court then properly rejected the implied and conflict preemption arguments. Guided by the admonition that "'it generally serves no useful public policy to prohibit local government from deciding local issues,'" the court found it "particularly obvious [that] no useful public policy is advanced by construing the executive order's narrow language as precluding *all* local government from enacting *any* further emergency measures in discharging its innate responsibility of safeguarding the life and property of its citizens during [a] natural emergency." *Ibid.* (quoting *Miami-Dade County v. Dade Cty. Police Benevolent Ass'n*, 154 So. 3d 373, 380 (Fla. 3d DCA 2014)). The Governor's order, therefore, did not impliedly preempt the County's order. Moreover, because "a conflict between an ordinance and statute will not be found where the ordinance and the statute can coexist such that compliance with one does not require violation of the other," the court found no conflict between the Governor's order and the County's orders. *Ibid.*

This Court must follow *Square One*—a state intermediate appellate court decision ruling on issues of state law—and dismiss the preemption claims.[30] Notably, Judge Singhal recently relied

---

[30]   *See United States v. Harris*, 941 F.3d 1048, 1055 n.2 (11th Cir. 2019) ("[A]bsent a decision from the state supreme court on an issue of state law, [courts] are bound to follow decisions of the

on *Square One* without incident in a case challenging a Broward County emergency order barring on-site sales of food from midnight to 5:00 a.m. *See 828 Mgmt., LLC v. Broward County*, — F. Supp. 3d —, 2020 WL 7635169, at *6 (S.D. Fla. Dec. 21, 2020) (applying "the *Square One* analysis" to reject plaintiffs' express preemption claim), *appeal filed*, No. 20-14868 (11th Cir. Dec. 30, 2020). This Court must do the same.

The Plaintiffs acknowledge *Square One*'s existence, but they handwave its import, contending that because the decision was issued at the preliminary injunction stage it "has no precedential effect, but is merely persuasive." Compl. ¶ 170 n.10. While it is true that "any expression on the merits of a case by an appellate court reviewing an order granting or denying a preliminary injunction, where review is based on a record made at a less-than-full hearing, will not be binding at trial on the merits," *Gonzalez-Barrera v. Majora Towers Condo., Inc.*, 272 So. 3d 424, 425 n.1 (Fla. 3d DCA 2019), the Plaintiffs neglect to account for the fact that the Third District's opinion did not turn on an analysis of the evidentiary record at the preliminary injunction hearing. Indeed, the decision relies on the text of the Governor's order (a public record), the text of the County's orders (also public records), and Florida caselaw governing statutory interpretation and preemption. The Third District answered pure questions of law. The Plaintiffs do not explain how exactly these outcome-determinative texts or the applicable law would change at a trial on the merits. Instead, they assert, without support, that "[t]he analysis in that case is flawed and strained." Compl. ¶ 170 n.10. That's not enough. *Cf. Valle v. First Nat'l Collection Bureau, Inc.*, 252 F. Supp. 3d 1332, 1343 (S.D. Fla. 2017) (Scola, J.) (electing to "give[] great weight" to two relevant Florida state court decisions while noting that the plaintiff "d[id] not substantively address these decisions, dismissing them as 'non-binding'"). *Square One* is a published state appellate opinion directly controlling of the issues presented here. Neither a request for en banc review nor a request that the Florida Supreme Court grant discretionary review is pending in that action.[31] There is no split in the Florida appellate districts. There is thus no basis for this Court to take any course other than to follow this

---

state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently."); *Bravo v. United States*, 532 F.3d 1154, 1164 (11th Cir. 2008) ("[B]ecause we are bound to decide the issue the way the Florida courts would have, we look to the decisions of the Florida appellate court that would have had jurisdiction over an appeal in this case had it been filed in state court. . . . This case was filed in the Miami Division of the United States District Court for the Southern District of Florida. State courts located there are within the territory of, and are bound to follow decisions issued by, the Third District Court of Appeal.").

[31] It is telling that the plaintiffs in *Square One*—represented by the same counsel as the Plaintiffs

precedent and to conclude that the curfew orders are not preempted.[32]

Because the curfew orders are not preempted, there is no basis for the Plaintiffs to claim that they are *ultra vires*. "[A] municipality, county, or town engages in an 'ultra vires' act when it lacks the authority to take the action under statute or its own governing laws." *Liberty Counsel v. Fla. Bar Bd. of Gov'rs*, 12 So. 3d 183, 191-92 (Fla. 2009). "Under article VIII, section 1(g) of the Florida Constitution, chartered counties" like Miami-Dade "have the broad authority to enact county ordinances not inconsistent with general law." *Square One*, 2020 WL 6472542, at *5. And the Florida Statutes, "from which the Governor's own enumerated and delegated emergency powers derive, equally 'confers upon the governing body of each political subdivision of the state the emergency powers provided herein.'" *Ibid.* (quoting Fla. Stat. § 252.32(1)(b)); *see also* Fla. Stat. § 252.38(1) ("Safeguarding the life and property of its citizens is an innate responsibility of the governing body of each political subdivision of the state."). "Thus, counties and municipalities are ordinarily understood to have police powers that include the enactment of curfews." *Square One*, 2020 WL 6472542, at *5 (citing *Municipal Court v. Patrick*, 254 So. 2d 193, 195 (Fla. 1971)). The County validly enacted its curfew under the powers granted it by the Florida Constitution and Florida Statutes. The Plaintiffs cannot show that they are likely to prevail on these claims.

**B.    The Plaintiffs have not shown a likelihood of success on the merits of their constitutional claims because the curfew orders are a lawful exercise of the County's authority to issue emergency orders to protect public health.**

The Plaintiffs' constitutional claims invoke the bodies of case law and standards of review governing such claims. But the County orders challenged here were not issued in ordinary times, so they cannot be evaluated in ordinary ways. *See Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020) (courts "do not evaluate orders issued in response to public-health emergencies by the standard that might be appropriate for years-long notice-and-comment rulemaking"). That's because under our Constitution, which "principally entrusts the safety and the

---

here—did not seek either avenue of review. Were the Third District's analysis as "flawed and strained" as these Plaintiffs purport it to be, Florida appellate procedure provided remedies.

[32]  Even if this Court were not bound to follow the Third District ruling on issues of state law, it should nevertheless reach the same conclusion because *Square One* was correctly decided. There is no express, implied, or conflict preemption between the County's curfew orders and the Governor's executive orders. The Plaintiffs' business remains open and operating, and its employees are not prevented from working. Had the Governor intended to include curfews within his preemption, he has had several months since *Square One* to add such language to his order. That he hasn't done so is a probative indication that the Third District got it right.

health of the people to the politically accountable officials of the States to guard and protect," *Swain*, 961 F.3d at 1293-94 (quoting *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring)), states and their subdivisions "have wide latitude in issuing emergency orders to protect public safety or health," *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1179-80 (11th Cir. 2020).[33]

The County's orders—implemented as they were to combat the unprecedented public health crisis triggered by the COVID-19 pandemic—must be weighed under the deferential standard of review adopted by the Supreme Court in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *see In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020) (characterizing *Jacobson* as "the controlling Supreme Court precedent that squarely governs judicial review of rights-challenges to emergency public health measures"). There, the Court rejected a challenge to a compulsory vaccination law enacted during a smallpox epidemic, holding that because "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members," "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson*, 197 U.S. at 27, 29.

At its core, *Jacobson* instructs that "*all* constitutional rights may be reasonably restricted to combat a public health emergency." *In re Abbott*, 954 F.3d at 786. The decision restricts courts presiding over suits challenging those measures to reviewing whether the enactment "has no real or substantial relation" to public health and safety "or is, beyond all question, a plain, palpable invasion of rights." *Jacobson*, 197 U.S. at 31; *cf. Robinson*, 957 F.3d at 1180 (approving of district court's conclusion, applying *Jacobson*, that state order, if applied to proscribe abortions unless necessary for the mother's life or health, "imposed a 'plain, palpable invasion of rights,' yet had 'no real or substantial

---

[33] *See also South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) (government officials have especially broad authority when they "undertake to act in areas fraught with medical and scientific uncertainties"); *Calvary Chapel of Bangor v. Mills*, — F.3d —, 2020 WL 7585178, at *4 (1st Cir. Dec. 22, 2020) ("[T]he public interest demands that public officials be accorded considerable latitude to grapple with the dynamic and fact-intensive considerations involved in mounting an effective response."); *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 952 (9th Cir. 2020) ("[T]he Governor imposed restrictions based on the public health emergency created by COVID-19 . . . . [T]hose restrictions were more than amply justified on grounds of public health."); *Democratic Nat'l Comm. v. Bostlemann*, 977 F.3d 639, 643 (7th Cir. 2020) ("Deciding how best to cope with difficulties caused by disease is principally a task for the elected branches of government. This . . . has been central to our own decisions that have addressed requests for the Judicial Branch to supersede political officials' choices about how to deal with the pandemic.").

MIAMI-DADE COUNTY'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

relation' to the state's goals"). The limited scope of review *Jacobson* permits does not include room to pass judgment on the "wisdom and efficacy" of the emergency measures, *In re Abbott*, 954 F.3d at 783, for that would impermissibly "usurp the functions of another branch of government," *Jacobson*, 197 U.S. at 28. Indeed, as the Chief Justice has admonished, where government officials act within their authority, they "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *South Bay*, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring) (citing *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).

This Court should also be guided by another binding case in which the Eleventh Circuit determined that a curfew issued pursuant to Miami-Dade County's emergency powers survived constitutional scrutiny. *Smith v. Avino*, 91 F.3d 105 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). The court in *Smith* upheld an emergency curfew the County imposed in the wake of Hurricane Andrew, concluding that curfews "imposed as an emergency measure in response to a natural disaster" are lawful so long as they are "taken in good faith and . . . there is some factual basis for the decision that the restrictions imposed were necessary to maintain order." *Id.* at 109.[34] The court noted the consistent holding across many cases that "it is a proper exercise of police power to respond to emergency situations with temporary curfews." *Ibid.* The plaintiffs, who conceded that the curfew—enacted "in direct response to the official emergency declared by the Governor of the State and the factual emergency conceded to exist"—was necessary when imposed, made no suggestion that the County acted in bad faith. *Ibid.* On that basis, the court held that "[t]he nature of the emergency and the exigency of the time warranted the imposition and length of the curfew." *Id.* at 110.

*Smith*'s holding applies with equal force here.[35] The Plaintiffs admit that the County bases its

---

[34] That curfew, which lasted nearly three months, initially applied countywide from 7:00 p.m. to 7:00 a.m. but was later modified to apply from 10:00 p.m. to 5:00 a.m. and only in a specified area of southern Dade County. *Smith*, 91 F.3d at 108. Notably, the curfew had "no stated exceptions for necessary travel to or from work, school, religious activities, or in connection with medical or personal emergencies for the residents; nor were there exceptions for emergency personnel, such as ambulance drivers or firefighters to enter the area during the curfew" *Id.* at 109.

[35] In a recent decision denying a temporary restraining order to a plaintiff challenging enforcement of a Key West curfew implemented over the New Year's holiday, Judge King declined to apply *Smith* because "COVID-19, while deadly and severe, does not present the same concerns of looting, chaos, and violence during riots that may result from a natural disaster." *Day v. Johnston*, No. 20-10151, 2020 WL 7711681, at *3 n.2 (S.D. Fla. Dec. 29, 2020). Respectfully, this Court should part ways with that reasoning. The Eleventh Circuit's analysis in *Smith* did not turn on

enactment of the challenged curfew on stemming the spread of the pandemic. *See* Compl. ¶ 18. Yet they have failed to "clearly establish," *Wreal, LLC*, 840 F.3d at 1247, that the curfew orders were enacted in bad faith or without any factual basis. To be frank, they couldn't if they wanted to. COVID-19 is a potentially lethal respiratory disease for which there is no known cure. It has killed nearly 375,000 Americans. *COVID-19 Map*, Johns Hopkins Univ. (Jan. 11, 2021), https://corona-virus.jhu.edu/map. Miami-Dade County holds the unfortunate distinction of being the county with the fourth-highest number of confirmed cases in the United States (326,607) and the seventh-highest number of deaths (4,413). *COVID-19 United States Cases by County*, Johns Hopkins Univ. (Jan. 10, 2021), https://coronavirus.jhu.edu/us-map. The County has observed that young adults are a key driver of infections. *See supra* notes 9-20 and accompanying text. Young adults partying during late night hours carry the disease into their parents' and grandparents' homes. This curfew—which applies to all similarly situated businesses for only six hours each night, is directly addressed at preventing the type of activity that, if allowed, would continue to spread the disease. There is clearly "some factual basis" for the curfew order.[36] The Plaintiffs have not demonstrated a "clear or substantial" likelihood that the orders have "no real or substantial relation" to protecting public health or public safety. In addition, they have failed to submit any evidence to support a claim that the County issued the curfew orders for any reason other than to combat the spread of COVID-19. Consequently, they cannot challenge the orders.

To rule otherwise—to weigh competing methods of addressing the emergency, or to fiddle at the margins of the County's response—would be inappropriate. "[G]overning authorities must be granted the proper deference and wide latitude necessary for dealing with the emergency." *Smith*, 91 F.3d at 109. Although it may be true that "[u]nder usual and normal circumstances and as a

---

concerns of looting or violence. And even if it did, those concerns are not a necessary condition, given their absence from the analysis of the compulsory vaccination measure in *Jacobson*. In any event, this curfew is no less directed at saving lives than is a curfew instituted to stem civil unrest.

[36] The Plaintiffs disagree with the County's chosen solution or think it should be applied in a more sweeping manner to make it fair. The County is not required to respond to a public health emergency as the Plaintiffs prefer. *See Jacobson*, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be most effective for the protection of the public against disease . . . That [is] for the [State] to determine in the light of all the information it had or could obtain."). Even assuming that the "some factual basis" test is equally onerous as rational basis review (and not, as *Jacobson* and *Smith* suggest, less onerous), the Plaintiffs' disagreement has no weight. "A legislative classification may be based on rational speculation unsupported by evidence. For that reason, a law may be rational even if in a particular case it appears to discriminate irrationally." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1035 (11th Cir. 2020).

MIAMI-DADE COUNTY'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

general proposition" the County may not order its residents to abide by a curfew, "the circumstances existing at [this] time [are] not usual, nor [are] they normal." *Ibid.* In the face of a rampaging disease, the County's curfew orders "cannot be affirmed to be, beyond question, in palpable conflict with the Constitution." *Jacobson*, 197 U.S. at 32. The Plaintiffs' constitutional rights are not implicated. They are therefore not entitled to injunctive relief.

**III.    The Plaintiffs have not shown a likelihood of success on the merits of their First Amendment claims because the curfew orders are content-neutral restrictions aimed at curbing the secondary effects of certain types of venues.**

Even if the Court were to decline to uphold the curfew orders as valid exercises of public health authority under *Jacobson* and *Smith*, they nevertheless survive traditional First Amendment analysis. To begin, the Plaintiffs are wrong that the curfew draws distinctions based on speech. The curfew is content-neutral on its face:

> Commencing on July 3, 2020, a curfew is *imposed for all of Miami-Dade County*, including incorporated and unincorporated areas, effective from 10 p.m. each night through 6 a.m. the next morning, until cancelled or revised. During the period of such curfew, *no person* shall make use of any street or sidewalk for any purpose . . . .

Miami-Dade County Emergency Order No. 27-20 (emphases added); *see also* Miami-Dade County Emergency Order No. 30-20. Neither curfew order references adult entertainment venues, which operate under the same restrictions as malls, movie theaters, bars, nightclubs, playhouses, and other similar venues.[37] The curfew orders are wholly unconcerned with speech; they are instead concerned with ensuring that conduct at certain businesses does not result in COVID-19 spreading into the broader community.

The curfew orders fit squarely in the long line of precedent allowing regulations affecting adult businesses if they are designed to limit the off-site impacts those enterprises create. These cases hold that such regulations are *not* subject to strict scrutiny, even if they are expressly targeted at adult businesses. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986). In *City of Renton*, the Supreme Court analyzed a Renton, Washington, zoning ordinance that restricted the area of the city available to adult entertainment venues. The ordinance was "not aimed at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community," so the Court deemed it "completely consistent with our definition of 'content-neutral' speech regulation." *City of Renton*, 475 U.S. at 47. From there, the Court ana-

---

[37]   This list is fatal to the Plaintiffs' constitutional underinclusiveness claim; they are without basis to assert that the curfew does not apply to malls, movie theaters, and playhouses.

lyzed the constitutionality of the ordinance as a content-neutral time, place, and manner restriction, which are "acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Ibid.* The Court concluded that the ordinance "clear[ly]" met that standard: It was narrowly tailored to serve the city's "interest in attempting to preserve the quality of urban life," and it allowed for reasonable alternative avenues of communication because more than five percent of the entire land area of Renton—"consist[ing] of ample, accessible real estate"—was open to use as adult theater sites. *Id.* at 50, 53.

In short, under *City of Renton*, a local government may validly apply regulations that affect the unfettered operation of adult entertainment venues if those regulations are related to a substantial government interest in limiting those venues' off-site impacts and provide alternative means of engaging in speech. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 433-42 (2002) (reaffirming "the *Renton* framework"); *see also Daytona Grand v. City of Daytona*, 490 F.3d 860 (11th Cir. 2007); *Zibtluda, LLC v. Gwinnett County ex rel. Bd. of Comm'rs*, 411 F.3d 127 (11th Cir. 2007).[38] *City of Renton*'s framework, established to deal with off-site impacts of business activity, maps clearly onto this case, in which businesses where parties occur export COVID-19 into the community.[39]

---

[38] The Plaintiffs try to dodge *City of Renton* wholesale by asserting that the curfew orders' exemption for religious services converts the orders into a content-based restriction on anything that is not a religious service, citing *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). They posit that *Reed* mandates strict scrutiny be applied once a law draws any kind of distinction. The Eleventh Circuit does not share their view:

> [T]he majority opinion in *Reed* does not address [*City of Renton*'s] secondary-effects doctrine. For this reason alone, we cannot read *Reed* as abrogating either the Supreme Court's or this Circuit's secondary-effects precedents. The rule is simple: "If a precedent of the Supreme Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions." . . . The Supreme Court's and our secondary-effects precedents are on all fours with the adult-entertainment regulations before us. *Reed*, which addressed a sign code, is not. We therefore follow the secondary-effects doctrine because it has "direct application" in this case[.]

*Flanigan's Enters., Inc. v. City of Sandy Springs*, 703 F. App'x 929, 935 (11th Cir. 2017) (quoting *Rodriguez v. Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also Free Speech Coal., Inc. v. Att'y Gen.*, 825 F.3d 149, 161 n.8 (3d Cir. 2016) ("[I]t is doubtful that *Reed* has overturned the *Renton* secondary effects doctrine."); *BBL, Inc. v. City of Angola*, 809 F. 3d 317, 326 n.1 (7th Cir. 2015) ("We don't think *Reed* upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment, a category . . . [that] occupies the outer fringes of First Amendment protection."). *City of Renton*, not *Reed*, is the applicable standard.

[39] Even if *City of Renton* were not to apply, the curfew would be analyzed as a content neutral time, place, and manner restriction. *See Day*, 2020 WL 7711681, at *3-4 (citing *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)).

Applying this framework to the County's curfew orders is an easy task. The orders are not directed at the content of the Plaintiffs' speech. Rather, they draw distinctions based on conduct—distinctions between locations where drunken partying is likely to occur and locations where such partying is unlikely to occur.[40] A church is allowed to open for midnight Mass, not because the County favors their speech rights over the Plaintiffs' but because religious services can be attended while masked, and because it is vanishingly unlikely that a drunken party is going to break out in the pews; drunken parties, by contrast, are the Plaintiffs' business model, and people eating and drinking can't wear masks.[41] Government offices are open during the curfew but restaurants are closed not because the government favors its own speech, but because strangers cannot gather at a government building after midnight for alcohol-infused revelry. This explains why Judge King had little difficulty in concluding that Key West's COVID-19 curfew, which barred large gatherings but "exempted essential businesses and religious services" was subject to (and was likely to survive) intermediate scrutiny as a reasonable "time, place, and manner" restriction. *Day v. Johnston*, No. 20-10151, 2020 WL 7711681, at *3-4 (S.D. Fla. Dec. 29, 2020). The County's curfew, like Key West's, is content neutral, and thus intermediate scrutiny is warranted.

With content neutrality established, *City of Renton*'s other two elements fall into place. *First*, the curfew is narrowly tailored to serve a substantial government interest. "Stemming the spread of COVID-19 is unquestionably a compelling interest[.]" *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam). And the narrow tailoring requirement is satisfied "so long as the regulation promotes a substantial government interest that would be achieved less effec-

---

[40] Setting aside these distinctions, the County must respect the Governor's orders requiring that religious services be observed and professional sports facilities be operational. *See supra* note 5.

[41] One court recently observed that exotic dancing poses unique risks for transmission:

> Exotic dancers are compensated for their close, often physical, interactions with customers, resulting in confined congregating and mingling that does not allow for social distancing. They earn their livings by performing on a shared stage, providing intimate "lap dances," and personally engaging customers in close proximity. Each of these circumstances increases the risk of transmission. Moreover, exotic dancers typically work for cash tips—a frequently touched form of payment—and often there is significant physical touching between multiple dancers and multiple customers throughout an evening. Exotic dance clubs also regularly hold special events, performances, and shows, which draw patrons to arrive and depart at the same time, another circumstance known to increase transmission risks. In short, the exotic-dance industry is driven by close, personal contact of the very sort known to be directly responsible for mass person-to-person spread of COVID-19.

> *Bimber's Delwood, Inc. v. James*, — F. Supp. 3d —, 2020 WL 6158612, at *10 (W.D.N.Y. Oct. 21, 2020).

tively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). The County's approach does not need to be scientifically perfect. *See Daytona Grand*, 490 F.3d at 880 ("[A] city must have latitude to experiment, at least at the outset, and . . . very little evidence is required."). It is enough that, without the curfew, the County would be significantly hindered from preventing the unchecked spread of COVID-19.[42] *Cf. Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1361-62 (11th Cir. 1999) (hours of operation rule requiring adult entertainment establishments to close from 2:00 a.m. until noon every day was narrowly tailored to "[c]ombat[] the harmful secondary effects of adult businesses, like increased crime and neighborhood blight").[43]

*And second*, reasonable alternative avenues of communication are available. The Plaintiffs have the other eighteen hours out of every day to convey their erotic message.[44] It has been settled since *City of Renton* that minimal limits on hourly operations do not deprive adult entertainers of adequate alternative avenues for expression. The Eleventh Circuit recognized as much in *Lady J. Lingerie* when it held that the City of Jacksonville's more restrictive 2 a.m.-to-noon hours of operation rule left open reasonable alternative avenues of expression. *See* 176 F.3d at 1364 ("adult businesses may stay open fourteen hours a day, seven days a week"); *see also Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.,* 411 F.3d 777, 789-91 (6th Cir. 2005) (en banc) (ordinance that allowed adult film store to be open for twelve hours a day provided adequate avenue of expression). If the Constitution is not offended by a municipality limiting hours of operation to address routine quality of life concerns, as Jacksonville did, it is hard to fathom how it could be offended by Miami-Dade County

---

[42] *See* Marty Aff. ¶ 19.

[43] The Plaintiffs' belief that masking and social distancing alone are sufficient tools, *see* Compl. ¶¶ 100-101, misses the point of the curfews. Masking and social distancing rules that are not observed do not slow the spread; issuing a citation to an individual after the fact does not somehow render an infected person safe to be around someone else. People carousing and drinking—maskless—late at night are precisely those who are most likely to forget these requirements and become infected as a result. Alcohol impacts judgment and risk assessment. *See 219 S. Atl. Blvd. v. City of Fort Lauderdale*, 239 F. Supp. 2d 1265, 1278 (S.D. Fla. 2002) ("It is rational [to believe] that the later in the night people are consuming alcoholic beverages in nightclubs and other establishments, the more likely crime and especially public corruption will occur."). The curfew directly targets this compliance gap. It gives businesses eighteen hours to cater to young and old, at times when people are more likely to comply with masking and social distancing rules. The curfew takes away the six hours in which businesses primarily cater to those looking for a good time at the expense of good sense and good hygiene.

[44] Not only that, but contrary to the Plaintiffs' assertions, the curfew would allow them to engage in online erotic dancing. Employees are allowed to travel to work at a "business interacting with customers solely through electronic or telephonic means." *See* Amendment No. 4 to Emergency Order No. 27-20, *supra* note 3, at Exhibit A ¶ gg.

MIAMI-DADE COUNTY'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

limiting hours to keep its citizens alive. There is nothing inherently constitutionally suspect with this curfew, especially given that is not directed at nude dancing. The Plaintiffs have failed to make a strong enough showing that they are likely to prove the curfew orders violate the First Amendment.

Accordingly, should the Court not conclude that *Jacobson or Smith* justify the curfew orders, it must still find them permissible under *City of Renton*.

## IV.   The individual Plaintiffs have not shown a likelihood of success on the merits of their claims under the Florida Constitution because the curfew orders survive strict scrutiny.

The individual Plaintiffs also seek injunctive relief on the grounds that the curfew infringes on their right to privacy and their right to freely associate under the Florida Constitution. *See* Pls.' Motion 13-16. They rely on *State v. J.P.*, 907 So. 2d 1101 (Fla. 2004), for the proposition that a curfew can be imposed only if it survives strict scrutiny. Pls.' Motion 13-14. At issue in *J.P.* were Tampa and Pinellas Park's juvenile curfew ordinances, which did not allow minors on public roads or sidewalks between 11:00 p.m. and 6:00 a.m., Sunday through Thursday, and 12:01 a.m. and 6:00 a.m. on Saturdays, Sundays, and legal holidays. 907 So. 2d at 1106. The Florida Supreme Court concluded that these ordinances violated the right to privacy guaranteed by the Florida Constitution and the right to travel because they were not narrowly tailored to achieve the governmental interest of protecting youth from crime. In particular, the ordinances could not withstand strict scrutiny because the curfews did not allow exemptions for juveniles on errands with consent of their parents and because the criminal penalties associated with violations of the curfews were antithetical to the interest. *See generally id.* at 1110-19.

The court did not articulate any standard of review governing limited duration curfews enacted pursuant to an ongoing emergency. The curfews in *J.P.* were enacted to respond to routine issues of juvenile criminality and did not have a sunset date. The curfews here, by contrast, are enacted for the limited purpose of responding to a once-in-a-century pandemic and will expire as soon as the state of emergency terminates. Moreover, Florida's right to privacy is confined to protecting those limited instances where a person actually has a reasonable expectation of privacy. *See Winfield v. Div. of Pari-Mutuel Wagering*, 477 So. 2d 544, 547 (Fla. 1985). If there is no reasonable expectation of privacy, there is nothing for the privacy clause to protect. *See City of North Miami v. Kurtz*, 653 So. 2d 1025, 1028 (Fla. 1995) (no reasonable expectation of privacy for smokers who alleged discrimination by private businesses); *Palm Beach County v. D.B.*, 784 So. 2d 585, 588 (Fla. 4th DCA 2001) ("whether an individual has a legitimate expectation of privacy is determined by

considering all the circumstances, especially objective manifestations of that expectation"). During a pandemic, persons do not have the same expectations of privacy they might normally. If quarantines of travelers, limits on group size, and other drastic interventions into personal movement are both demanded and expected by the public during an outbreak of disease, there is no expectation of privacy which would implicate the curfew. Absent that expectation, the curfew is analyzed under the "highly deferential" rational basis test—which it clearly survives, because a regulation subject to rational basis review "can only be invalidated if it is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational." *Ga. Elec. Life Safety & Sys. Ass'n v. City of Sandy Springs*, 965 F.3d 1270, 1275 (11th Cir. 2020).

Even if strict scrutiny were warranted, the curfew survives. The County's interest in stopping the spread of COVID-19 is paramount. *See Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 67; *Varholy v. Sweat*, 15 So. 2d 267, 269 (Fla. 1943) ("[T]he preservation of the public health is one of the prime duties resting upon the sovereign power of the State. The health of the people has long been recognized as one of the greatest social and economic blessings. The enactment and enforcement of necessary and appropriate health laws and regulations is a legitimate exercise of the police power which is inherent in the State and which it cannot surrender."). The means chosen to achieve that interest are narrowly tailored. The County enacted the curfew only when it was apparent that the social distancing and sanitization rules in effect were insufficient.[45] Moreover, the curfew contains exemptions necessary for public health and safety and "[t]he scope of the exceptions to the curfew is of more significance in assessing whether an ordinance is narrowly tailored." *J.P.*, 907 So. 2d at 1117. The curfew allows vital infrastructure, medical, and safety businesses to operate, and for employees to travel to and from them. It allows those businesses to make deliveries. It allows religious services to be conducted. It allows for medical treatment. It allows persons to walk their dogs. It allows persons to travel to a friend's or relative's house before curfew and spend the night.

---

[45] Moon Aff. ¶¶ 7-13. The Curfew is certainly more narrowly tailored than other tools employed throughout the pandemic, such as wholesale closures of large segments of the community, compulsory quarantines of persons traveling from outside the state, bans on gatherings of more than ten people, and complete bans on in-person dining in restaurants. If the curfew is not a narrowly tailored response, it is hard to see how these other actions enacted variously by the County, other local governments throughout the state, and the Governor would not also be deemed to be unconstitutional. It would be ironic if the good faith efforts of local government, taken consistently with jurisdictions around the nation to save the lives of their citizens, were to boomerang into crushing local liability.

The curfew lasts only six hours. The state of emergency, and thus the curfew, must be renewed every seven days.[46] Given these exemptions, it is impossible to say the curfew is not narrowly tailored.[47]

Lastly, the Plaintiffs suggest that the curfew cannot be narrowly tailored because persons who have already had COVID-19 and recovered are still subject to the curfew. They suggest that it is impossible for those persons to spread COVID-19 because they are "functionally immune from reacquiring the disease," and thus the curfew cannot rationally be applied to them. Pls.' Motion 16 n.20. This is untrue and it was untrue when the Complaint was filed. *See Reinfection with COVID-19*, CDC (Oct. 27, 2020) [ECF No. 20-20] ("Cases of reinfection with COVID-19 have been reported, but remain rare."). This so-called "functional immunity" to COVID-19 is far from fact. It remains unclear whether recovered persons can be reinfected and spread COVID-19, and if so, how soon after their recovery. *See* Jop de Vrieze, *More People Are Getting COVID-19 Twice, Suggesting Immunity Wanes Quickly in Some*, Science (Nov. 18, 2020) [ECF No. 20-21]. There is even uncertainty as to whether *vaccinated* persons can spread the disease, notwithstanding their individual immunity. The CDC currently recommends that persons who have been vaccinated continue to wear masks and practice social distancing because the efficacy of a vaccine at preventing spread (as opposed to preventing an infected person from becoming seriously ill) remains uncertain. *Frequently Asked Questions About COVID-19 Vaccination*, CDC (Dec. 29, 2020) [ECF No. 20-22].[48]

This case is not the mechanism through which rapidly changing immunological, epidemiological, and public health questions can be given concrete answers. And given this uncertainty—and given the impact the wrong decision could have on innocent residents, it cannot be unconstitutional for the County to continue to require recovered persons to comply with the curfew.

---

[46] *See* Fla. Stat. § 252.38(3)(a)(5) ("The duration of each state of emergency declared locally is limited to 7 days; it may be extended, as necessary, in seven-day increments.").

[47] The Plaintiffs also argue that curfews with criminal penalties are not narrowly tailored. This is a misreading of *J.P.*, which merely held that, in that case, incarcerating juveniles who violated the curfew made no sense since the point of the curfew was to protect juveniles from harm. 907 So. 2d at 1118. It did not announce a blanket bar on criminal penalties. That notwithstanding, the County, as a matter of policy, has sought to limit the use of criminal penalties to enforce its Emergency Orders and has instead used civil citations to the extent possible. Hanlon Aff. ¶ 26.

[48] There are practical concerns, as well. Are the Plaintiffs asking the Court to order the County to mandate that individuals provide their medical records to the Miami-Dade Police Department, thus rendering those documents public records? Tests results can come from any number of private sources. There is no standardized official document a resident could hand to police to show their epidemiological status, making fraud and mistake likely. Even if the Plaintiffs' suggestion were medically appropriate, it's not feasible.

## CONCLUSION

The analysis will end here one way or the other. Should the Court find the Plaintiffs likely to succeed on the merits, the County concedes that the other elements of the preliminary injunction analysis favor them, as well.[49] That said, the Court should find that these Plaintiffs *have* failed to satisfy their heavy burden to show likelihood of success on the merits of any of their claims. And where, as here, the party moving for preliminary injunction fails to demonstrate that it is likely to prevail, courts "do not need to address the remaining preliminary injunction requirements." *Keister v. Bell*, 879 F.3d 1282, 1288 (11th Cir. 2018); *see Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("No matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is no chance that the movant will eventually prevail on the merits."). Accordingly, the motion for preliminary injunction should be denied.

[SIGNATURE BLOCK APPEARS ON NEXT PAGE]

---

[49] *See Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("Because the ordinances are an unconstitutional direct penalization of protected speech, continued enforcement, for even minimal periods of time, constitutes a per se irreparable injury. . . . The nonmovant is the government, so the third and fourth requirements—'damage to the opposing party' and 'public interest'—can be consolidated. It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance."); *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012) ("Plaintiffs are under the threat of state prosecution for crimes that conflict with federal law, and we think enforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable. We therefore agree . . . that Plaintiffs have met their burden[.]"); *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1263-64 (Fla. 2017) (plaintiffs showed likelihood of success that state law was unconstitutional as a violation of Florida's right to privacy, and court found that enactment of the law would lead to irreparable harm and an injunction would serve the public interest).

Dated: January 11, 2021.

Respectfully submitted,

ABIGAIL PRICE-WILLIAMS
MIAMI-DADE COUNTY ATTORNEY

By: */s/ David M. Murray*

    David M. Murray, Fla. Bar No. 291330
    dmmurray@miami-airport.com
    Lauren E. Morse, Fla. Bar No. 97083
    laurenm@miamidade.gov
    Angela F. Benjamin, Fla. Bar No. 15914
    abenjam@miamidade.gov
    Zach Vosseler, Fla. Bar No. 1008856
    zach@miamidade.gov
    Assistant County Attorneys

    Stephen P. Clark Center
    111 N.W. First Street, Suite 2810
    Miami, Florida 33128
    (305) 375-5151

    *Counsel for Miami-Dade County*

## CERTIFICATE OF SERVICE

On January 11, 2021, I electronically filed this document with the Clerk of Court via CM/ECF and served a copy on all counsel of record via CM/ECF.

    */s/ Zach Vosseler*
    Zach Vosseler
    Assistant County Attorney