[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10879

_____

D.C. Docket No. 5:19-cv-00436-AKK

JAMES HENDERSON,
CAROL HENDERSON,

                                                                                           Plaintiffs-Appellants,

versus

MARK MCMURRAY,
CITY OF HUNTSVILLE, ALABAMA,

                                                                                           Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(February 9, 2021)

Before WILLIAM PRYOR, Chief Judge, GRANT and TJOFLAT, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

       This appeal involves a civil-rights suit brought by two prolife sidewalk counselors against the City of Huntsville and Chief of Police Mark McMurray.

James and Carol Henderson allege that McMurray and the City violated their First Amendment rights to freedom of speech and the free exercise of religion through their application of the City's permit ordinance and the inclusion of a noise provision in their special-event permit. The district court dismissed the Hendersons' complaint for failure to state a claim. Because the complaint failed to allege critical facts necessary to establish a violation of the Hendersons' constitutional rights, we affirm.

## I. BACKGROUND

Like millions of Americans, James and Carol Henderson believe that abortion is the murder of an unborn child. Abortion is contrary to their sincerely held religious beliefs, and they act upon those beliefs by standing on the public sidewalks near two Huntsville, Alabama, abortion clinics to express their views, pray, and offer counsel to clinic employees, visitors, and patients who pass by. The Hendersons' typical activities constitute a "minor event" under the Huntsville municipal code and do not require a permit. But the Hendersons are not the only ones who advocate for their views about abortion outside the clinics—there are also counter-protests from abortion-rights advocates.

The presence of the abortion-rights advocates makes it more difficult for the Hendersons to make their speech heard for two reasons. First, the Huntsville municipal code requires simultaneous sidewalk events to be held at least ten feet

apart, and the Hendersons allege that the abortion-rights advocates take advantage of that policy by obtaining permits for events in front of the clinics and forcing the Hendersons to the other side of the street. And second, the abortion-rights advocates drown out the Hendersons by shouting and ringing cowbells. The Hendersons allege that the City does nothing about this abusive conduct, even though the Hendersons assert it violates the municipal code.

In response to the tactics of the abortion-rights advocates, the Hendersons use raised voices and sometimes amplification to make their message discernable. Using amplification arguably makes the Hendersons' activities a "sound event" requiring a permit under the municipal code, so the Hendersons have obtained a special-event permit every six months for the last several years. Because the Hendersons' permits did not initially contain any special noise provision, their use of amplified sound was governed by the 62-decibel limit in the City's noise ordinance.

In 2017, McMurray acted in his official capacity to add a new noise provision to the Hendersons' special-event permit. The Hendersons do not allege that McMurray added the new noise provision only to their permit and not to other permits. The new noise provision provided that "[t]he amplified sound produced by a participant in the event shall not be plainly audible inside adjacent or nearby

buildings." It included the following definition of "plainly audible" amplified sound:

> [A]mplified sound is plainly audible if the amplified sound can be clearly heard inside an adjacent or nearby building by a person using his normal hearing faculties, provided that the person's hearing is not enhanced by any mechanical device, such as a microphone or hearing aid. As long as the amplified sound is plainly audible by a person inside the building using normal hearing faculties, the particular words or phrases being produced need not be determined.

The Hendersons allege that the new noise provision—unlike the old 62-decibel standard—fails to provide any objective means by which they can assess their compliance, and that it places the subjective means for assessing compliance exclusively in the hands of people in the abortion clinics who are hostile to their message. They allege that the resulting vagueness and overbreadth are unconstitutional and render the permit requirement arbitrary and capricious.

The Hendersons were unable to convince the City that the new noise provision was unconstitutional. When the Hendersons signed their permit application with a caveat that they would observe its conditions "subject to the US and Alabama Constitution and advice of counsel," the City informed them that the application would not be granted with the caveat. The Hendersons then agreed to follow the new noise provision as written.

The Hendersons sued the City of Huntsville Police Department and the City for civil-rights violations. 42 U.S.C. § 1983. They later amended their complaint

4

and named McMurray as a defendant instead of the Police Department. In Count I, the Hendersons alleged that McMurray and the City violated their right to freedom of speech by requiring them to get a permit and by adding the noise provision to their special-event permit. In Count II, the Hendersons alleged that McMurray and the City violated their right to free exercise of religion by enforcing the permit ordinance and imposing a noise provision that prevents them from exercising their religion by speaking about what they believe and counseling people in accordance with their beliefs. They cited the decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), in support of Count II and argued that their free-exercise claim "is entitled to strict-scrutiny review under the hybrid-rights doctrine" articulated in that opinion. The Hendersons also alleged that the noise provision was vague and overbroad, but neither count relies on that allegation.

McMurray and the City moved to dismiss the amended complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). The district court granted their motions. It rejected the Hendersons' as-applied challenge to the permit ordinance because the ordinance was a reasonable content-neutral regulation of the time, place, and manner of speech, and the Hendersons did not allege any facts establishing that McMurray and the City apply it in a discriminatory or otherwise unconstitutional manner. The district court rejected their challenge to the noise provision in their

special-event permits for similar reasons. It concluded that the Hendersons did not plead viewpoint discrimination, that the provision was narrowly tailored to a significant government interest, and that the Hendersons did not adequately plead that the noise provision left them without ample alternative channels of communication. It concluded that the noise provision was at least as clear as noise ordinances that have been upheld in other decisions. And the district court rejected their free-exercise claim because the noise provision was a neutral, generally applicable law rationally related to a significant government interest. It refused the Hendersons' invitation to apply strict scrutiny based on the hybrid-rights doctrine, dismissing the relevant language in the Supreme Court's *Smith* decision as dicta.

## II. STANDARD OF REVIEW

We review *de novo* a dismissal of a complaint for failure to state a claim, and we accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Timson v. Sampson*, 518 F.3d 870, 872 (11th Cir. 2008).

## III. DISCUSSION

We divide our discussion in three parts. First, we explain that the Hendersons abandoned their as-applied challenge to the permit ordinance and failed to include allegations necessary to support their challenge to the noise provision in their special-event permits. Second, we reject the Hendersons'

6

vagueness argument. And third, we conclude that the Hendersons' free-exercise claim is too unlike the hybrid claims previously recognized by the Supreme Court to benefit from the hybrid-rights doctrine.

> A. *The Hendersons Failed to Plead Necessary Facts to Support an Inference That the Noise Provision Violates Their Right to Freedom of Speech.*

The Hendersons alleged two separate violations of their right to freedom of speech in their amended complaint. First, they alleged that the City's permit ordinance is unconstitutional as applied to them. And second, they alleged that the noise provision in their special-event permits is unconstitutional. But they abandoned their as-applied challenge on appeal, and they failed to allege facts in the amended complaint to support their challenge to the noise provision.

> 1. The Hendersons Abandoned Their As-Applied Challenge to the City's Permit Ordinance.

The Hendersons alleged in their amended complaint that the City had an unconstitutional policy of "allowing a group to obtain a permit for traditionally protected speech on the public sidewalk and thereby exclude other groups from the same sidewalk" and that the "requirement of a permit under the circumstances . . . restrict[ed] [their] right to free speech" in violation of the First Amendment. In other words, the Hendersons alleged that the permit ordinance was unconstitutional as applied in a situation where counter-protestors use the permit process to force another speaker from a public place.

The Hendersons clarified the nature of their as-applied challenge to the permit ordinance in their response to the motions to dismiss. They explained that "the proabortion counter[-]protestors always reserve the sidewalk in front of the building, [so that] the Hendersons are forced to go to the other side of a busy street and try to communicate their message over heavy traffic and noise from the proabortion counter[-]protestors." In that situation, the Hendersons said, the permit requirement "puts them in an impossible situation: give up their right to free speech (which is unconstitutional), or risk violating the permit's noise requirements (which is illegal)." They conceded that they did not challenge the permit ordinance on its face. In the absence of any allegations of discriminatory treatment on behalf of the City, the district court upheld the City's permit ordinance as a reasonable and content-neutral restriction on the time, place, and manner of speech.

The Hendersons do not renew the as-applied argument they made before the district court on appeal. Instead, they make the much broader argument that "an individual on the public sidewalk holding a sign, calling out to a woman in ordinary outdoor tones offering information or assistance, or even handing her a pamphlet, *cannot be required to obtain a permit before doing so*," in *any* circumstance. They also argue, for the first time, that McMurray and the City targeted them for selective enforcement of the permit ordinance by adding

8

provisions to their special-event permits while allowing abortion-rights advocates to operate without a permit at all, while declining to enforce "laws [that] would protect [their] right to peacefully express themselves or offer information to women." We do not consider these arguments because they were never raised before the district court, *see Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004), and because the Hendersons fail to support them with citations to authority, *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). The Hendersons abandoned the only as-applied challenge to the permit ordinance they made before the district court.

2. The Hendersons Failed to Plead Necessary Facts to Support their Challenge to the Noise Provision.

We review this challenge using a settled framework. For a public forum like a sidewalk, a city may regulate the time, place, and manner of speech "so long as the restrictions '[1] are justified without reference to the content of the regulated speech, . . . [2] are narrowly tailored to serve a significant governmental interest, and . . . [3] leave open ample alternative channels for communication of the information.'" *Pine v. City of West Palm Beach*, 762 F.3d 1262, 1268 (11th Cir. 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (alterations and omissions in *Pine*). We must evaluate whether the Hendersons' complaint alleged the necessary facts that would allow a plausible inference that the City failed to conform to this framework.

The Hendersons argue that they pleaded facts establishing the noise provision fails two of the requirements from *Ward*. First, they maintain they pleaded the noise provision does not "leave open ample alternative channels for communication." *Ward*, 491 U.S. at 791 (internal quotation marks omitted). And second, they say they pleaded the noise provision was not "justified without reference to the content of the regulated speech," *id.* (emphasis omitted), because it was motivated by viewpoint discrimination. The Hendersons do not dispute that the noise provision is "narrowly tailored to serve a significant governmental interest." *Id.* (internal quotation marks omitted). We address their arguments in turn.

    a. <u>The Hendersons Failed to Plead That the Noise Provision Does Not Leave Them with Ample Alternative Channels of Communication.</u>

The Hendersons' primary argument on appeal is that the noise provision does not "leave open ample alternative channels for communication." *Id.* (internal quotation marks omitted). But their amended complaint is short on allegations to that effect. It includes a conclusory allegation that "[t]he permit's requirements do not leave ample alternative channels of accomplishing the communication." But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And whether a set of facts amounts to the denial of ample alternative channels of communication is a legal conclusion to be made by the reviewing

court, *see, e.g.*, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 53–54 (1986), not a fact to be alleged in the complaint.

The closest thing in the complaint to a factual allegation that the noise provision left the Hendersons without ample alternative channels of communication is their allegation that the presence of counter-protestors forced them to "employ raised voices and sometimes amplification to make their message discernible." But even if we infer that the Hendersons "sometimes [employed] amplification to make their message discernible" because the use of *unamplified* sound was sometimes ineffective in the face of counter-protests, the Hendersons never actually alleged that the noise provision made the use of *amplified* sound ineffective. Because the Hendersons did not allege that they were unable to effectively use amplified sound within the limits set by the noise provision, their argument that the noise provision does not leave open ample alternative channels for communication fails.

b. <u>The Hendersons Failed to Plead That the Noise Provision Is a Pretext for Viewpoint Discrimination.</u>

The Hendersons also argue they alleged facts establishing that the noise provision—although content-neutral on its face—was a pretext for viewpoint discrimination. The relaxed scrutiny for regulations of the time, place, and manner of speech applies only to regulations that are "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791 (internal quotation marks

11

omitted). But regulations "that were adopted by the government because of disagreement with the message the speech conveys . . . , like those that are content based on their face, must [instead] satisfy strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (alteration adopted) (internal quotation marks omitted).

The problem for the Hendersons is they never alleged that McMurray and the City added the noise provision to their special-event permit because they disapproved of the Hendersons' prolife viewpoint. The closest the Hendersons came to doing so was their allegation that "pro-choice advocates . . . employ loud shouting and even the ringing of cowbells to drown out their message" in violation of the Huntsville municipal code, and that McMurray and the City "fail to protect the Hendersons from this thuggery." But even accepting the inference that the City's alleged failure to enforce the law is the result of its hostility to the Hendersons' prolife viewpoint, the Hendersons never allege that the addition of the noise provision to their special-event permit was motivated by the same hostility.

Nothing in the Hendersons' complaint connects the addition of the noise provision to viewpoint discrimination. They did not allege that the permits were changed following a negative interaction with the City or abortion-rights advocates, that other special-event permits do not contain the same noise provision as theirs, that the City contemplated adding the provision as way to silence them,

12

or anything else suggesting the noise provision was designed to target their prolife viewpoint.

The Hendersons argue that viewpoint discrimination is evident from the fact that abortion-rights advocates can make loud noise (with their voices and cowbells) while the Hendersons are prevented from doing so (with amplification). But their apples-to-oranges comparison fails. The Hendersons never alleged that only abortion-rights advocates can use loud unamplified sound or that only they are prohibited from using loud amplified sound. Even as alleged by the Hendersons, the two sides are subject to the same rules regarding amplified and unamplified sound. The Hendersons did not allege that the noise provision was a pretext for viewpoint discrimination, so the district court did not err by evaluating the regulation under the *Ward* framework instead of applying strict scrutiny.

### B. The Noise Provision Is Not Unconstitutionally Vague.

The Hendersons alleged in their amended complaint that the noise provision was unconstitutionally vague, but they did not rely on that allegation in either of the two substantive counts. They instead included a section on vagueness in their response to the motions to dismiss, and the district court discussed vagueness as a standalone claim in its memorandum opinion. The Hendersons argue that the noise provision is unconstitutionally vague for two reasons.

13

First, the Hendersons argue that the noise provision does not give fair notice of what conduct is prohibited so that they may act accordingly. They acknowledge that "the language in the provision is plain enough." But they insist that the noise provision nonetheless violates the Due Process Clause because it is difficult for them to figure out how to comply with it without "resort[ing] to guessing."

This argument fails because "factual circumstances that sometimes make it difficult to determine whether an incriminating fact exists" do not make a law vague. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1047 (11th Cir. 2020) (en banc). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). The Hendersons know what must be proved to establish a violation of the noise provision: that their amplified sound can be "clearly heard inside . . . [a] nearby building" through the use of "normal hearing faculties." That they are not in a strong position to ascertain the fact of audibility does not make the noise provision vague.

Second, the Hendersons argue that the noise provision is unconstitutionally vague because "it risks chilling more speech than necessary." True, vague speech regulations are problematic in part because they have a chilling effect on speech. *See Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 871–72 (1997). But a statute

may be overbroad and have an unconstitutional chilling effect on speech even if it is not vague. *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972) ("A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct."). The Hendersons failed to make an overbreadth argument before the district court or on appeal, and they fail to explain why the noise provision's alleged chilling effect on their speech renders it unconstitutionally vague.

### C. The District Court Did Not Err by Refusing to Apply Strict Scrutiny to the Hendersons' Free-Exercise Claim.

The Hendersons argue that the district court erred by refusing to apply strict scrutiny to their claim that McMurray and the City violated their right to freely exercise their religion. The Hendersons alleged in their amended complaint that they "have a sincere religious belief that abortion is the wrongful killing of an unborn child," and that "[i]f they are unable to speak what they believe and counsel people in accord with their beliefs, they will not be able to exercise their religion." They argue that their free-exercise claim "is entitled to strict-scrutiny review under the hybrid-rights doctrine of *Employment Division v. Smith*." But they do not contest the conclusion that their free-exercise claim fails if the hybrid-rights doctrine does not apply because "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Smith*, 494 U.S. at 879 (internal quotation marks omitted).

15

The "hybrid-rights doctrine" is derived from a paragraph in *Smith* in which the Supreme Court explained why its decision was consistent with earlier decisions recognizing rights to exemptions from general laws that incidentally burdened the free exercise of religion. *See, e.g.*, *Wisconsin v. Yoder*, 406 U. S. 205 (1972). The Court explained that religious belief *alone* did not excuse non-compliance with the law in any of its previous decisions:

> The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, or the right of parents . . . to direct the education of their children.

*Smith*, 494 U.S. at 881 (citations omitted). This exception to the ordinary rule for free-exercise claims articulated in *Smith* is often called the "hybrid-rights exception" or "hybrid-rights doctrine."

The Hendersons argue that their free-exercise claim is a hybrid claim that is excepted from the normal operation of the *Smith* rule. "The free-exercise claim and the free-speech claim rest on the same set of operative facts: the Hendersons are speaking a religious message in which they believe." So they contend their claim is a hybrid that is not subject to *Smith*'s general rule and the rational-basis review that comes with it. The Hendersons argue that all such hybrid claims are entitled to strict scrutiny. *See Sherbert v. Verner*, 374 U.S. 398, 403 (1963).

The district court refused to recognize the hybrid-rights doctrine and dismissed the relevant portions of *Smith* as dicta, citing *Leebaert v. Harrington*. 332 F.3d 134, 143 (2d Cir. 2003) ("Given our understanding of the *Smith* statement as dicta, we are not bound . . . to apply some stricter standard of review than the rational basis test to hybrid claims.") The district court also relied on the statement in *Smith* that the claim at issue did "not present . . . a hybrid situation." 494 U.S. at 882. It suggested that our decision in *Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011), amounted to a rejection of the doctrine. And it stated that the Supreme Court has never recognized a hybrid claim since *Smith*, and that this Court has not done so either.

The district court was wrong to disregard the hybrid-rights doctrine as dicta. Inferior courts owe more fidelity to the opinions of the Supreme Court than the Second Circuit showed in *Leebaert*. Even if the relevant language in *Smith* is dicta, *but see Telescope Media Grp. v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019), we are obligated to respect it, *see* Bryan A. Garner et al., *The Law of Judicial Precedent* § 4, at 69–72 (2016). "[T]here is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006).

Nor does our decision in *Keeton* establish a rejection of the hybrid-rights doctrine. To be sure, *Keeton* applied rational-basis review to an appeal that could have been argued as a hybrid claim. 664 F.3d at 879–80. But that means only that

Keeton's claim was not a valid hybrid. There is plenty of room to fashion an application of the hybrid-rights doctrine consistent with the result in *Keeton*, which involved state-sponsored speech unique to the context of higher education. *Id.* at 881 (W. Pryor, J., concurring) ("When a student expresses her intent to violate the rules of a state-sponsored clinical program, the university may require her to provide reasonable assurances that she will comply with its requirements before the university permits the student to participate in the clinical program."). The fact that, since *Smith*, neither the Supreme Court nor this Court has recognized a valid hybrid claim is also not dispositive; it does not mean hybrid claims do not exist.

As an inferior court, we must do the best we can with the hybrid-rights doctrine—dicta or not. The Hendersons' free-exercise claim is subject to the general rule of *Smith* not because the hybrid-rights doctrine is dicta, but because their claim—as alleged—is not similar to the hybrid free-speech and free-exercise claims the Supreme Court recognized in *Smith*.

In *Smith*, the Supreme Court identified three of its previous decisions as involving speech-exercise hybrid claims. 494 U.S. at 881 (citing *Cantwell v. Connecticut*, 310 U.S. 296 (1940); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943); and *Follett v. Town of McCormick*, 321 U.S. 573 (1944)). Those decisions recognized a speech-exercise hybrid claim where a speech regulation—in each case, the prohibition of door-to-door soliciting without a license—was akin to

18

censorship, and when that censorship prevented members of a religion from proselytizing their beliefs. *See Cantwell*, 310 U.S. at 301–02, 305, 307; *Murdock*, 319 U.S. at 106, 108, 113; *Follett*, 321 U.S. at 574, 577–78. In *Cantwell* in particular, the Supreme Court explained that the regulation was far more intrusive than "general and non-discriminatory legislation regulat[ing] the times, the places, and the manner of soliciting," because "[i]f a certificate [was] procured, solicitation [was] permitted without restraint but, in the absence of a certificate, solicitation [was] altogether prohibited." 310 U.S. at 304.

The Hendersons' claim is not like the speech-exercise hybrid claims distinguished in *Smith*. It cannot fairly be said that the City has censored the Hendersons or that they are disabled from spreading their beliefs to the same extent as the religious believers in *Cantwell*, *Murdock*, and *Follett*. The Hendersons do not allege that the City has barred them from proselytizing their belief in the sanctity of human life outside of abortion facilities, only that their task is more difficult in the light of the noise provision and the presence of abortion-rights advocates. We will not extend the hybrid-rights doctrine so far beyond the limits described in *Smith*. And because the Hendersons do not argue that the district court otherwise erred by concluding that the noise provision and permit ordinance are neutral laws of general applicability rationally related to a legitimate governmental

19

interest, *see Keeton*, 664 F.3d at 880, we conclude that the district court correctly applied the general rule of *Smith* to dismiss their free-exercise claim.

## IV. CONCLUSION

We **AFFIRM** the dismissal of the Hendersons' amended complaint.